### MASSACHUSETTS TRUSTEES OF EASTERN GAS AND FUEL AS-SOCIATES, Libelants,

v.

### UNITED STATES of America, Respondent.

### No. 55–26.

United States District Court
D. Massachusetts.

May 2, 1962.

James S. Eastham, Boston, Mass., Kominers & Fort, Washington, D. C., for libelant; William M. Brady, Boston, Mass., J. Franklin Fort, Israel Convisser, Washington, D. C., of counsel.

W. Arthur Garrity, Jr., U. S. Atty., Boston, Mass., for respondent; Levenworth Colby, Lawrence F. Ledebur, Attys., Admiralty & Shipping Section, Dept. of Justice, of counsel.

WYZANSKI, District Judge.

1. On January 15, 1962 this Court issued an opinion, 202 F.Supp. 297, that the final judgment when entered herein should include the dismissal of libelant's first and second causes of action and the dismissal of respondent's first cause of action. This opinion is now amended in the following respects:

(a) In Section E, finding 14, pages 16 and 17 [at page 308] the second sentence of the finding is amended to read, "The Government had vessels which it alleges had a fair charter hire of over 2 million dollars."

(b) Section F, Adjudications, paragraph 2, page 17 [at page 308] is deleted. At the time the opinion was writ-

ten Eastern had not had adequate opportunity to present evidence with respect to its second cause of action.

2. March 23, 1962 the parties by stipulation settled libelant's third cause of action and respondent's third and fourth causes of action. March 26, 1962 the Court entered a decree based on that stipulation.

3. There now remains for consideration only libelant's second cause of action. This cause of action, already summarized in the main opinion, has two aspects. The broader contention is that with respect to the year 1947 the Commission should have charged for all vessels chartered by Eastern during that year a rate calculated upon the accumulative net voyages profits for the year of all such vessels. The narrower contention is that the Commission had no right to require two separate accountings of the voyage profits of, respectively, the S. S. ISAAC SHARPLESS and the S. S. WASHINGTON IRVING. Each claim turns on the question whether the Government had an unfettered right to terminate the bareboat charters.

4. As the opinion of January 15, 1962 notes, on October 1, 1946 Eastern and the Commission entered into bareboat charters, Contract No. MC c–41881, for the use of certain Government owned vessels. Many of the terms of that Contract are set out in the opinion and need not be repeated. But it is now appropriate to quote Part II, Clauses 14 and 27, of the Contract.

"CLAUSE 14. *Termination.* Either the Owner or the Charterer may terminate the period of use of any of the vessels by giving written notice to the other party at least fifteen (15) days prior to the termination of any voyage hereunder, in which event the vessel shall be redelivered at the port of redelivery provided for in Clause G of Part I hereof upon termination of the voyage during which such notice is given."

"CLAUSE 27. *Cancellation or Modification by Mutual Consent: Waivers.* This agreement may be terminated, modified, or amended at any time by mutual consent."

5. While Eastern was using the chartered vessels, the Commission on August 15, 1947 sent to Eastern and other charterers, a telegram stating:

"The use of any and all vessels chartered to your company pursuant to the provisions of Shipsalesdemise 303 is hereby terminated as follows:

"With respect to vessels whose voyages terminate on or after August 31, 1947 this telegram shall be deemed to be the owner's fifteen days notice of cancellation pursuant to Clause 14 of Part II of the Charter.

"With respect to vessels whose voyages have terminated or will terminate prior to August 31, 1947 this telegram will also be deemed to be the owner's fifteen days notice of cancellation pursuant to said Clause 14 and/or Clause C(2) of Part I. You will be given opportunity to continue the use of vessels under charter pursuant to new terms and conditions to be announced within the next few days.

"If within seven days from date hereof you advise as to those vessels which are engaged solely in domestic trade, the Commission will except such vessels from this notice."

6. The Commission on August 20, 1947 sent to Eastern and other charterers a telegram stating:

"Pursuant to the Commission notice of August 15, 1947, as to the termination of the use of all vessels chartered to your company subject to the provisions of Shipsalesdemise 303, the U.S. Maritime Commission today authorized an addendum to its bareboat charter agreement for warbuilt vessels, "Shipsalesdemise

303", effective as of September 1, 1947, providing substantially as follows:

"1. Rates of basic and additional charter hire for foreign trade remain unchanged stop

"2. Period of about six months, but no voyages to be commenced after February 29, 1948, subject to termination as to any vessels on fifteen days' notice by either party to be given after a period of sixty days from the date when the vessel becomes subject to the provisions of the addendum stop

"3. The payment of additional charter hire pursuant to Clause 13 shall be computed separately for those voyages commenced prior to September 1, 1947, and those which commence under the addendum to the charter agreement herein authorized, with the understanding that the Maritime Commission may permit charterers to establish reserves for repair expenses and expenses usually covered by P & I insurance stop

"Please advise not later than August 27, 1947, if you accept the addendum as specified herein. Upon written notice being given of such acceptance, you are authorized to continue the use of any vessels now chartered to you pursuant to Shipsalesdemise 303 under the present terms and conditions as to any approved voyages commencing prior to September 1, 1947, but the voyages of any new vessel allocations after August 20, 1947, shall be under the terms and conditions of the addendum. If such written notice of acceptance of the addendum is not received by the Commission on or before August 27, 1947 all vessels, pursuant to the provisions of Shipsalesdemise 303, shall be redelivered in accordance with the terms of such charter upon completion of approved voyages commenced prior to September 1, 1947."

7. August 25, 1947, Eastern sent a telegram to the Commission stating:

"Retel yours of August 15 and August 20 we accept addendum specified your wire of August 20 and have all vessels now chartered to us pursuant to Ship Sales Demise Charter Form 303 committed load coal during September with one exception which vessel loads early October."

8. In October, 1947, the Commission and Eastern executed Addendum No. 7 to the charter which embodied the terms of the foregoing telegrams. The relevant terms of that Addendum follow:

"WHEREAS, on August 15, 1947, the Owner served notice of termination pursuant to Clause 14, Part II, with respect to vessels hereunder operating in foreign trades, and simultaneously advised that the Charterer would be given an opportunity to continue the use of such vessels under charter in accordance with new terms and conditions to be announced, and

"WHEREAS, such new terms and conditions were promulgated by the Owner on August 20, 1947, and were accepted by the Charterer, with respect to the vessels hereinafter named, and

"WHEREAS, the parties hereto desire to amend this Agreement accordingly.

"NOW, THEREFORE, in consideration of the premises, this Agreement is hereby amended as follows with respect to vessels engaged in foreign trades, which are listed on the attached schedule marked 'Exhibit A' and made a part hereof by reference:

\*  \*  \*  \*  \*  \*

"III. *Additional Charter Hire.* Additional charter hire, pursuant to Clause 13, Part II, shall be computed, accounted for and paid separately for voyages which are subject to the terms of this addendum, which shall be treated for accounting purposes as if it constituted a separate charter between the parties."

The vessels remained under the charter, as so amended, and none was redelivered.

9. During the year 1947 the voyages of Eastern's chartered vessels which commenced prior to September 1, 1947, resulted in profits for which, under the terms of clause 13 of the charter, libelant became obligated to pay additional charter hire in the amount of approximately $516,696. The voyages which commenced after September 1, 1947 resulted in losses of approximately $118,000 (after adjustments required as a result of the stipulated settlement of libelant's third cause of action).

10. On July 10 and August 2, 1947, respectively, Eastern entered into single voyage charters with Association Technique De L'Importation Charbonniere ("ATIC"), an agency of the French Government, for the carriage of two full cargoes of coal from Baltimore to French ports. These voyage charters named the bareboat-chartered vessels S.S. ISAAC SHARPLESS and S.S. WASHINGTON IRVING, with contemplated loading of the first vessel between August 18–28, 1947, and of the second vessel between September 1–13, 1947. These voyage charters were submitted to, and approved by, the Director of Traffic of the Maritime Commission prior to August 15, 1947, in accordance with clause 22 of the charters, and the regulations quoted below.

11. In June of 1946, and subsequently, the Commission issued regulations applicable to all bareboat charters, requiring that copies of all voyage charters which contemplated the use of the chartered vessels be submitted to the Director of Traffic for approval before such voyage charters were executed. The provisions of these regulations were summarized in a circular letter to all bareboat charterers dated February 10, 1947, reading in part as follows:

"In order that there be no further misunderstandings we bring to your attention a few of the requirements which *must* be adhered to in order to avoid violation of your bareboat charter.

"(1) *All* proposed voyages must be submitted to this office for approval *prior* to the actual fixing of the vessel. This may be done by telephone or telegram, setting forth rates, terms and conditions of the proposed venture. (It is suggested that your offers for fixtures be made subject to the approval of the Maritime Commission.)

"(2) After a proposed voyage with its attendant rates, terms and conditions has been approved, a certified copy of all charters, booking agreements, or contracts of affreightment shall be submitted to this office. (If this has not been done, copies of all charters, etc., should be submitted to this office immediately. (Emphasis in original.)

\* \* \* \* \* \*

"Bareboat charterers who fail to comply with the foregoing requirements and the provisions set forth in W.S.A. Bareboat Regulation No. 3 may violate the provisions of their fleet charter and incur the penalties set forth therein. Kindly be guided accordingly."

12. The voyage charters with ATIC each contained clauses reading as follows:

"29. It is understood that the owners of the vessel (United States and/or Maritime Commission) has the right under Clause #14 of the bareboat charter existing between the owners of the vessel and MYSTIC STEAMSHIP DIVISION, EASTERN GAS & FUEL ASSOCI-

826

ATES, Bareboat Chartered Owner, to terminate the period of use of the vessel by giving written notice to the bareboat charterers at least 15 days prior to the termination of any voyage. Should the owner of the vessel exercise this prerogative or any other prerogatives it may have under the bareboat charter existing with MYSTIC STEAMSHIP DIVISION, EASTERN GAS & FUEL ASSOCIATES, that might frustrate the performance of this charter, then this charter to be cancelled without penalty or liability on the part of any of the parties hereto. The Bareboat Chartered Owners shall have the option of substituting a similar Liberty steamer in a similar position, if this charter is so cancelled.

"30. This contract is subject to the approval of the U. S. Maritime Commission."

13. Eastern and ATIC entered into said two voyage charters with knowledge of Clause 29. The voyages were commenced and completed after September 1, 1947, in accordance with the voyage charter terms, and the two vessels were thereupon redelivered to the Maritime Commission under the bareboat charter without making any further voyages. Libelant suffered losses as a result of the two voyages and the redelivery expenses incident thereto.

14. After executing without protest Addendum No. 7, Eastern consistently accounted for additional hire in accordance with its terms. Not until more than seven years had elapsed, that is on February 19, 1955, did Eastern challenge the Addendum or the accounting thereunder.

CONCLUSIONS

On the foregoing facts my first conclusion is that, as plainly appears, the Commission always reserved the right, capriciously or otherwise, to terminate the period of use of any of the vessels. Neither in any statute or contract was there an express or implied restriction upon its power. Just as a landlord with a reserved power to terminate a lease has the right to do so even if his object is to re-let even to the same tenant at a higher rental, so the Commission had the right to terminate even if it hoped that the charterer would immediately re-charter on terms less favorable to the charterer. The argument to the contrary seems to me to have no weight. And even if it did have, the charterer, which was uncoerced, elected not to press the point when it executed Addendum No. 7.

My second conclusion is that Eastern has no special ground of complaint with respect to the effect of the termination upon its voyage charters with ATIC. These voyage charters were, it is true, approved by the Commission. But the voyage charters in the most explicit terms of Clause 29 recognized the Commission's right of termination. In approving the voyage charters the Commission approved them as they stood, with the Commission's right of termination expressly reserved.

The second cause of action of libel is dismissed on the merits.