MR. Justice Harlan
 

 delivered the opinion of the Court.
 

 This case presents the claim that the Maritime Commission exceeded its statutory authority under § 5 of the Merchant Ship Sales Act of 1946, 60 Stat. 43, as amended, 50 U. S. C. App. § 1738, by
 

 (1) including in its contract with petitioners
 
 [1]
 
 for the bareboat charter of ships a sliding scale that required payment to the Government of more than 50% of certain excess profits and
 

 (2) using the threat of termination of the charter arrangement to compel agreement to divide the calendar year 1947 into separate periods for the purpose of computing such profits.
 

 
 *369
 
 Because a considerable number of suits are pending in the lower courts which will turn on resolution of these issues, and because of a conflict among the circuits as to the first issue,
 
 [2]
 
 we brought the case here. 375 U. S. 809. For reasons to follow, we affirm the judgment below upholding the power of the Commission to act as it did.
 

 I.
 

 The Merchant Marine Act, 1936, 49 Stat. 1985, as amended, 46 U. S. C. §§ 1101-1294, provided for the charter of government vessels by the Maritime Commission to private enterprise. Section 709 (a) of that Act, 49 Stat. 2010, incorporated by reference in the 1946 Act, § 5 (c), 60 Stat. 43, provided:
 

 “Every charter made by the Commission pursuant to the provisions of this title shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer’s fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum on the charterer’s capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum:
 
 Provided,
 
 That the cumulative net profit so accounted for shall not be included
 
 *370
 
 in any calculation of cumulative net profit in subsequent years.”
 

 During World War II, operations of the private merchant marine were disrupted and its fleets reduced by losses and requisition. Meanwhile many vessels were constructed for government operations. Congress by means of the Merchant Ship Sales Act of 1946,
 
 supra,
 
 sought to ensure postwar rehabilitation of the private merchant marine by having the Maritime Commission sell or charter surplus war-built government vessels. The Commission was instructed “so far as practicable and consistent with the policies of this Act, [to] give preference to . . . applicants to purchase” over applicants to charter.
 
 [3]
 
 Section 5 (b), 60 Stat. 43, of the Act set out standards for the Commission to follow in chartering vessels:
 

 “The charter hire for any vessel chartered under the provisions of this section shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act, but, except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as of the date of charter). . . . [R]ates of charter hire fixed by the Commission on any war-built vessel which differ from the rate specified in this subsection shall not be less than the prevailing world market charter rates for similar vessels for similar use as determined by the Commission.”
 

 As already indicated, § 5 (c) made the provisions of § 709 (a) of the Merchant Marine Act applicable to charters under the 1946 Act.
 

 
 *371
 
 Prior to the Commission’s exercising of its authority-under the 1946 Act, the War Shipping Administration chartered ships to private interests on an interim basis; it followed the lines of the 1946 Act, specifying a “basic charter hire” which equaled 15% per annum of the statutory sales price and an “additional charter hire” of one-half of any net profits in excess of a 10% annual return on the charterer’s capital employed in the operation of the chartered vessels. During this period a Special Charter Committee considered the best way to implement the provisions of the 1946 Act. Existing rentals were believed to be too low and higher rentals were thought necessary to promote the statutory policy of encouraging sales rather than charters. A majority of the Committee preferred a higher profit-sharing rate than that provided in § 709 (a) to any additional firm rental, since the former would permit both the Commission and charterers to adapt to a fluctuating world market, without imposing a greater risk of loss on the charterers. The Maritime Commission adopted this basic suggestion and decided to charge, in addition to the firm rental of 15% of the sales price, 50% of the average net voyage profits in excess of 10% of the charterer’s capital necessarily employed up to the first $100 of profits per day, 75% of the next $200 per day, and 90% of such profits above $300 per day.
 

 The Commission adopted a standard Ship Sales Act charter (“SHIPSALESDEMISE 303”) incorporating these provisions, and Eastern chartered 10 vessels under such a contract dated October 1,1946. Market conditions allowed high profits to be earned in the first eight months of 1947. The Commission decided to terminate existing charters, as it was privileged to do under the contract on 15 days’ notice, but agreed not to terminate if a charterer accepted an Addendum to its contract providing, among other things, for a separate calculation of profit-sharing
 
 *372
 
 rentals for the period commencing September 1, 1947. Eastern signed such an Addendum and was not able, as a result, to offset losses incurred in the latter part of 1947 against the excess profits earned before September 1.
 

 Eastern did not attempt to litigate its rights under the 1946 Act until it had completed all the payments required by the charter agreement. In 1955 it filed this
 
 in personam
 
 libel for recovery of money paid pursuant to the profit-sharing provisions and the 1947 “Foreign Trade Addendum.” It asserted that § 709 (a) sets a maximum as well as a minimum rate of profit sharing and precluded the Commission from altering that rate under § 5 (b). It claimed further that, even if such power existed, the Commission’s apparent reliance on § 709 (a) rather than § 5 (b) renders these charter provisions nugatory. Finally, it argued that the 1947 Addendum conflicted with the statutory mandate of § 709 (a) for calendar year accounting of statutory profits, and that the Commission abused its termination privilege by threatening to terminate the charter agreements of those refusing to accept the split-year profit-sharing arrangement. All of these contentions were rejected by the lower court, the Court of Appeals affirming the District Court, 202 F. Supp. 297; 210 F. Supp. 822, in a thorough opinion, 312 F. 2d 214.
 

 Preliminarily we observe that in the view we take of that case we find it unnecessary to consider the Government’s alternative ground for affirmance: that the doctrine of waiver precludes Eastern from challenging the terms of its charter agreement because once having signed the agreement and benefited from the charter, Eastern cannot seek to overturn provisions of the contract that it regards as unfavorable.
 
 [4]
 

 
 *373
 
 II.
 

 The basic statutory question is whether the Commission, in light of § 709 (a), had authority under § 5 (b) to impose the sliding scale of additional hire, and, if so, whether its failure to articulate the particular statutory basis for its action vitiates the validity of the profit-sharing terms of the rate set. We approach this problem with three general interpretative guides, all of which point in the Government’s favor. Some weight is due to the consistent interpretation of the Maritime Commission, the agency entrusted with administration of the statute. See,
 
 e. g., United States
 
 v.
 
 Zucca,
 
 351 U. S. 91, 96;
 
 Kern River Co.
 
 v.
 
 United States,
 
 257 U. S. 147, 153-154. The successive extensions by Congress of the Commission’s authority to charter vessels,
 
 [5]
 
 in the face of the Commission’s sliding-scale practice, are certainly not controlling, particularly since it does not appear that Congress ever advertently addressed itself to the claim of invalidity of the sliding scale; they do, however, strengthen to some extent the Commission’s conclusions regarding its chartering powers. In 1947, following subcommittee hearings,
 
 [6]
 
 the House Committee on Merchant Marine and Fisheries, H. R. Rep. No. 725, 80th Cong., 1st Sess. (1947), recommended an extension, subsequently enacted, 61 Stat. 190, 191, of the Commission’s chartering authority “with the understanding that the basic rates for the
 
 *374
 
 charter of dry-cargo vessels and recapture rates will be immediately increased, thus encouraging the purchase rather than charter of these ships.” P. 2. Congressional reports prior to another extension, H. R. Rep. No. 60, 81st Cong., 1st Sess., 2 (1949); S. Rep. No. 55, 81st Cong., 1st Sess., 2 (1949), stated: “It is contemplated that the Maritime Commission will continue to sell, charter, and operate ships in accordance with existing procedures and without [according to the House Report] any change in its present policy.” (The Senate Report reads “any changes in policies now effective.”)
 

 Further, in light of the congressional policy to encourage the sale of ships, contained in § 7 (a) of the 1946 Act,
 
 supra,
 
 there is an initial presumption that Congress intended that the Commission should have power to establish chartering terms commensurate with making more attractive purchase, instead of charter, of government vessels by private shipowners. Needless to say, these “interpretative aids,” neither singly nor in conjunction, could lead to an affirmance here if it were clear that the Commission’s action contradicted the requirements of the Merchant Ship Sales Act of 1946. However, they are consistent with, and lend support to, what we believe to be the most sensible view of the statutory framework.
 

 According to § 709 (a) of the 1936 Act, as adopted by the 1946 statute:
 

 “The charterer
 
 shall
 
 pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum . . . .” (Emphasis added.)
 

 Section 5 (b) of the 1946 Act provides:
 

 “The charter hire . . . shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act, but,... such rate shall not be less than 15 per centum per annum of the statutory sales price . . . .”
 

 
 *375
 
 Eastern makes the contention that the language of § 5 (b) itself limits the Commission’s power under that section to a fixed annual charter rate. It argues that a profit-sharing arrangement is not a “rate” of charter hire in the normal sense nor is it “fixed.” The short answer is that it is perfectly reasonable to speak of a “rate” which is based on percentage of profits, and there is no problem in “fixing” a contingent rate. Certainly the reference to the minimum rate of 15% (subject to an exception not relevant here) of the statutory sales price in no way reflects an intent to preclude the Commission from developing other types of rate patterns. We find nothing in § 5 (b) itself to justify strait-jacketing, by proscribing any approach not based on a percentage of the sales price, the Commission’s development of rate patterns best serving the policies of the Act.
 

 The position that § 709 (a) is the exclusive profit-sharing provision, that it prohibits what might otherwise be sustained as a proper exercise of power under § 5 (b), is somewhat more arguable. Eastern asserts that § 709 (a) was written as a maximum as well as minimum standard for the Commission’s share of excess profits and that its import was not altered by its adoption in the 1946 Act. Significance is placed on Congress’ use of the word “shall,” rather than a phrase such as “not less than,” in fixing the charterer’s obligation to pay 50% of its excess profits.
 

 However, when § 709 (a) was passed, rates of charter hire were determined in most situations, under § 707 (a), 49 Stat. 2009, by competitive bidding in individual cases.
 
 [7]
 
 
 *376
 
 Since the firm rental offered could afford the only basis for assessing “the highest monthly charter hire,” individual bidders did not propose profit-sharing arrangements. Under such a system, the primary reliance against rates unreasonably favorable to charterers was the bidding system. In that context, it could plausibly be urged that the Commission had no authority to raise its share of excess profits. Indeed, the Government does not argue that at that time, or after the 1946 Act, § 709 (a)
 
 ex proprio vigore
 
 conferred power on the Commission to raise the rates beyond the prescribed 50%. The relevant question, therefore, is whether as carried into the 1946 Act the section set a maximum as well as minimum rate of profit sharing for the statute as a whole.
 

 First, it may be noted that “shall” plainly denotes a minimum; one cannot pay 50% and at the same time pay less than 50%. On the other hand, the word does not of linguistic necessity denote a maximum; one can pay 50% and also pay 25% more. While, in recognizing this, we do not mean to suggest that standing alone the 50% standard of § 709 (a) would not be read as establishing a maximum as well as a minimum, it is significant that the section’s language is not inconsistent with a conclusion that higher percentages are permissible. Congress cannot be expected always to be absolutely precise in its statutory formulations. When it brings forward into a new enactment provisions drafted in a different statutory context and in response to other circumstances and policies, the likelihood of imprecision is increased. In light of the great breadth of discretion apparently given to the Commission under § 5 (b) and the expressed concern of Congress that charter rates not
 
 *377
 
 be too low to discourage sales, we should be very slow to fetter the flexibility of the Commission to implement, in the most effective way, the policies of the Act. Viewing the 1946 Act as an integrated whole, we refuse to inhibit the Commission under § 5 (b) by resort to an interpretation of § 709 (a) which could be characterized only as arid literalism.
 
 [8]
 

 We conclude, therefore, that the Commission had the power under § 5 (b) to impose the sliding scale and that § 709 (a) does not negate that authority. In passing, it may be noted that in addition to the courts below, four other lower courts have reached or assumed the same conclusion. See
 
 Dichman, Wright & Pugh, Inc.,
 
 v.
 
 United States,
 
 144 F. Supp. 922, 926;
 
 United States
 
 v.
 
 East Harbor Trading Corp.,
 
 190 F. Supp. 245, 249;
 
 American Mail Line, Ltd.,
 
 v.
 
 United States,
 
 213 F. Supp. 152, 163;
 
 United States
 
 v.
 
 Eastport Steamship Corp.,
 
 216 F. Supp. 649, 653-654. But see
 
 American President Lines, Ltd.,
 
 v.
 
 United States,
 
 224 F. Supp. 187, 190-191. See also
 
 American Export Lines, Inc.,
 
 v.
 
 United States,
 
 153 Ct. Cl. 201, 208-209, 290 F. 2d 925, 930.
 

 We next turn to the question whether § 5 (b) suffices to support the sliding scale for profit-sharing rentals adopted by the Commission, in the face of the assertion
 
 *378
 
 that the Commission did not purport to act under that section but apparently relied on § 709 alone. Eastern notes that the added obligation respecting excess profits was imposed as a part of “additional charter hire” under clause 13 of the charter agreement (“Form 303”), which included the 50% charge on excess profits less than $100 per day. Under “Form 203,” the standard charter employed pending implementation of the 1946 Act, the unembellished 50% rate of § 709 (a) had also been characterized as “additional charter hire” and appeared in clause 13 of that form. In both “Form 203” and “Form 303” provision for the “basic charter hire” — the relevant percent of the sales price — was provided for in clauses E, C (1), and 12. Eastern accordingly concludes that the Commission equated “basic charter hire” with hire under § 5 (b) and “additional charter hire” with that imposed under § 709 (a). Citing a number of cases holding that grounds not relied on by a government agency cannot be invoked to validate an exercise of administrative discretion which has in fact been based on insufficient grounds or reached without requisite procedural safeguards, see,
 
 e. g., Securities & Exchange Comm’n
 
 v.
 
 Chenery Corp.,
 
 332 U. S. 194, 196;
 
 Bell
 
 v.
 
 United States,
 
 366 U. S. 393, 412-413;
 
 Burlington Truck Lines, Inc.,
 
 v.
 
 United States,
 
 371 U. S. 156, 167-168, Eastern asserts that the failure of the Commission
 
 to
 
 indicate the statutory basis of its sliding scale for profit sharing renders that aspect of its charter agreements void. It is not entirely 'dear what the Commission believed the source of its power to be and it is at least arguable that inclusion of the sliding rates within the additional hire clause was not necessarily inconsistent with a supposition of authority under § 5 (b). We find it unnecessary, however, to deal with this question since we agree with the courts below that the intent of the Commission in this regard is irrelevant.
 

 
 *379
 
 The District Court determined that there is not “the slightest ground for assuming that if the Commission had been apprized of the correct source of its authority, the Commission or the other party would have made a contract different in substance, as distinguished from wording.” 202 F. Supp. 297, 305. Eastern does not seriously challenge this determination. Although it alleges that the Commission hesitated to act under § 5 (b) to raise the fixed 15% rate because such an increase would have been passed on to other government agencies as a result of contractual provisions for subcharter, Eastern does not assert that a contingent profit-sharing rate of more than 50% would likewise have been passed on even if the Commission had explicitly referred to § 5 (b) as its source of authority. The subcharter clause appearing in the record indicates that only an increase in the 15% fixed rate would have been passed on.
 

 No doubt is cast on the conclusion of the District Court by anything in § 5 (b) or § 709 (a). Section 5 (b) does not require a hearing or any particular kind of procedure (except when the rate is set below 15% of the sales price). Since § 709 (a) does not itself authorize deviations from the 50% rate on excess profits, that section provides, of course, no criteria for assessing the propriety of any such deviation. Section 5 (b) rates are supposed to be fixed “consistent with the policies of this Act” and (at least if lower than 15% of the statutory sales price) are not to be set at less than the prevailing world market charter rates. Since it is plain that the Commission instituted rates it believed to be consistent with the policies of the 1946 Act, it seems patently clear that its determination would have in no way varied had it paid particular attention to § 5 (b) in establishing the sliding scale.
 

 In light of these factors we find inapposite here cases refusing to validate an exercise of administrative discre
 
 *380
 
 tion because it could have been supported by principles or facts not considered, or procedures not undertaken, by the responsible body. These cases are aimed at assuring that initial administrative determinations are made with relevant criteria in mind and in a proper procedural manner; when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached, as in this instance (assuming there was such a mistake), the sought extension of the cases cited would not advance the purpose they were intended to serve. The imposition of the sliding scale of additional charter hire was authorized by § 5 (b) and the Commission’s failure to indicate explicitly or implicitly that that section was the source of its power is without legal significance.
 

 Eastern claims that if the sliding-scale charge is proper under § 5 (b), the Commission has not followed the statutory scheme for accounting. Section 709 (a) provides for equal division of profits after payment of the “charter hire reserved in the charter . . . .” Eastern equates this language with the “charter hire . . . fixed by the Commission” under § 5 (b). Without attempting the impossible task of reading into the charter contract the following method of accounting, Eastern argues that this procedure is required by the statute: In addition to the required percent of the statutory sales price, the “charter hire reserved in the charter” includes any charge above 50% of profits; after these charges are computed, the Commission is entitled to 50% of remaining excess profits. How this method would work is most easily seen if we hypothesize an attempt by the Commission to acquire 100% of all excess profits. Instead of achieving this goal, the Commission would have to compute the fixed hire plus 50% of the profits (the amount of charge above the 50% set by § 709 (a)). The Commission would then receive 50% of the remaining profits; as a consequence the
 
 *381
 
 charterer would retain 25% of the total excess profits. The effect of this method of accounting, therefore, would be to turn § 709 (a) into a provision limiting, under profit-sharing arrangements effected pursuant to § 5 (b), the Government’s share of profits over 10% of capital necessarily employed; the maximum government share would be 75% (instead of the 50% that would result if § 709 (a) were read to prohibit completely any profit-sharing arrangement under § 5 (b)).
 

 We are not compelled to accept this anomalous result. It is not necessary to read the reference in § 709 (a) to “charter hire reserved in the charter” as synonymous with “charter hire . . . fixed by the Commission” in § 5 (b). It is highly doubtful that the draftsmen intended such a result, particularly since § 709 (a) was brought forward without any attempt to spell out carefully its relationship to § 5 (b). A reading which does greater justice to the whole statutory framework is to limit “charter hire reserved in the charter” to any firm rather than contingent hire, regardless of whether § 5 (b) is'the source for imposing the hire. Even if Eastern’s interpretation of the language were acceptable, however, we see no reason why the Commission cannot reach under § 5 (b) what it would otherwise be paid under § 709 (a). If the sliding scale requires 90% of certain profits to be turned over to the Commission, it makes better sense to say that the Commission can take the full 90% under § 5 (b), thus rendering § 709 (a) superfluous, than to conclude that the Commission’s authority under § 5 (b) extends only to the incremental amount. According to Eastern’s argument § 709 (a) performs a dual function; it allocates that percent of profits which may be reached as “charter hire . . . fixed by the Commission” and it distributes the remaining profits. We think it clear that it was not intended in the context of the 1946 Act to perform the former role; therefore, even were any rate set under
 
 *382
 
 § 5 (b) taken to be “charter hire reserved in the charter,” no statutory impediment would preclude the Commission from taking the full 75% and 90% of excess profits. A contrary conclusion would require a strained reading of the language of the Act and would conflict with the policies enunciated therein.
 

 III.
 

 Because of the discouragement of sales resulting from the high profits earned by charterers in the first part of 1947, the Commission sent telegrams to Eastern and other charterers on August 15 informing them of the Commission’s intention to terminate the charter contracts, a privilege given to both parties under clause 14. The telegrams stated that the charterers would be able to continue use of the vessels if they agreed to new terms and conditions. On August 20, the Commission set out the new terms, including a provision that payment of additional charter hire under clause 13 be computed separately for voyages commencing'after September 1. Eastern agreed to the terms ysinte it suffered losses for its post-August voyages, it was required to pay to the Commission a greater amount than would have been the case had 1947 been treated as a unit for accounting purposes. Eastern claims that the “Foreign Trade Addendum” to its charter was invalid insofar as it purported to divide 1947 into two accounting periods. It argues that § 709 (a) required calendar year accounting, that agreement to the Addendum was insufficient to create a new charter contract, and that the Commission could not use its termination power to accomplish an improper result.
 

 We find this position untenable. There was no explicit limitation on the Commission’s power to terminate existing charters, nor do we read § 709 (a), which provides for computation of"additional charter hire “at the end of any calendar year,” as indirectly imposing such
 
 *383
 
 a restriction. The Commission could, therefore, have terminated all existing charters and rechartered the vessels to accomplish the end it sought. That the notification of termination was not a disingenuous threat to achieve an otherwise improper purpose is evidenced by the number of contracts which were, in fact, terminated subsequent to August 15. The Addendum states that it is to be “treated for accounting purposes as if it constituted a separate charter
 
 . . .
 
 We will not refuse to accord it significance simply because the Commission did not require the charterer to go through the formalities of the execution of a new contract.
 

 Affirmed.
 

 [1]
 

 Hereafter “Eastern:
 

 [2]
 

 Compare the opinion below, 312 F. 2d 214, and
 
 United States
 
 v.
 
 Eastport Steamship Corp.,
 
 216 F. Supp. 649, with
 
 American Export Lines, Inc., v. United States,
 
 153 Ct. Cl. 201, 290 F. 2d 925;
 
 Dichman, Wright & Pugh, Inc.,
 
 v.
 
 United States,
 
 144 F. Supp. 922;
 
 American Mail Line, Ltd.,
 
 v.
 
 United States,
 
 213 F. Supp. 152;
 
 American President Lines, Ltd.,
 
 v.
 
 United States,
 
 224 F. Supp. 187.
 

 [3]
 

 § 7 (a), 60 Stat. 44, 50 U. S. C. App. § 1740.
 

 [4]
 

 The Government does not press the claims here that Eastern cannot recover because of the running of the statute of limitations or because of voluntary payments made to the Commission. It asserts
 
 *373
 
 that these defenses were pleaded below but were not considered during the hearing; it reserves the right to raise them on remand in the event of a reversal.
 

 [5]
 

 See 61 Stat. 190, 191; 62 Stat. 38; 63 Stat. 9; 63 Stat. 349. In 1950, Congress abolished the Maritime Commission and the function of chartering ships was transferred to the Secretary of Commerce, 64 Stat. 308; 64 Stat. 1276, 1277.
 

 [6]
 

 Hearings before the Subcommittee on Ship Sales, Charters, and Lay-ups, House Committee on Merchant Marine and Fisheries, 80th Cong., 1st Sess. (1947).
 

 [7]
 

 Section 714 of the 1936 Act, 49 Stat. 2011, as amended, 46 U. S. C. § 1204, does provide for negotiated rates of charter hire if essential trade routes cannot otherwise be successfully developed. It contains a firm minimum rate. Had this been the primary method of chartering envisioned in 1936, the section's similarity to § 5 (b) of the 1946 Act would have considerable bearing on any interpretation of the relevance of § 709 (a) in the later Act. The exception this provi
 
 *376
 
 sion makes to competitive bidding, however, does not alter the fact that the basic method of rate setting was entirely different under the 1936 Act from that contemplated in 1946. We intimate no view as to the relationship between § 714 and § 709 (a) under the 1936 Act.
 

 [8]
 

 Eastern’s contention that the legislative history of the 1946 Act confirms its position is not well taken. That Congress did not disapprove of charters and that it provided separate safeguards to encourage sales does not undermine the plainly expressed preference of sales to charters and the concern that charter rates not be so low as to make purchase less profitable than hire. That some legislators believed the 15% rate of § 5 (b) to be high is irrelevant, since the Commission’s power to raise rates under § 5 (b) is undisputed and the issue here concerns only the kind of rate structure permissible. Finally, the circumscription of Commission discretion, which Eastern believes was intended by Congress, had to do with the desirability of having set rates instead of individually negotiated charters, rather than with the kinds of rates that might be set.