481 F.2d 479
 5 Empl. Prac. Dec. P 8564, 156 U.S.App.D.C. 304
 Robert BUSTOS, and Lupe Murquia, Appellants,
v.
John MITCHELL, Attorney General of the United States, et al.
Robert BUSTOS et al.,
United Farm Workers Organizing Committee, Appellant,
v.
John MITCHELL, Attorney General of the United States, et al.
Robert BUSTOS et al.,
Cirstobal Cardona et al., Appellants,
v.
John MITCHELL, Attorney General of the United States, et al.
 Nos. 72-1178, 72-1179 and 72-1200.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 26, 1973.
Decided April 16, 1973.
 
 1
 Bruce J. Terris, Washington, D. C., with whom Joseph Onek, Washington, D. C., was on the brief for appellants. John W. Karr, Washington, D. C., also entered an appearance for appellants.
 
 
 2
 Ralph Farb, Atty., Immigration and Naturalization Service, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, and Gil Zimmerman, Asst. U. S. Attys., were on the brief for appellees.
 
 
 3
 Before GEORGE C. EDWARDS, Jr.,* Circuit Judge for the Sixth Circuit, LEVENTHAL, Circuit Judge, and JOHN H. PRATT,** United States District Judge for the United States District Court for the District of Columbia.
 
 JOHN H. PRATT, District Judge:
 
 4
 This case challenges the legality of the system whereby the Immigration and Naturalization Service[1] for many years has permitted and continues to permit Mexican aliens[2] to commute either daily or seasonally from their place of residence in Mexico to employment in the United States. Plaintiffs-appellants Robert Bustos, an American citizen, and Lupe Murquia, a Mexican national permanently residing in the United States, are farm workers in California. The United Farm Workers Organizing Committee is an organization of farm workers whose purpose is to secure higher wages and better working conditions for its members. The defendant-appellees are the Attorney General, the Commissioner of the Service, and the Regional Commissioner of the Service for the Southwest Region. The defendants have the statutory responsibility of enforcing the immigration and naturalization laws of the United States.
 
 
 5
 Plaintiffs filed a class action in the United States District Court for the District of Columbia on behalf of all citizens and alien permanent residents of the United States engaged in farm labor in California. The complaint sought declaratory and injunctive relief against the practice of the Service in admitting daily and seasonal commuters into the United States to perform agricultural labor. Five farm workers in Texas were permitted to intervene as plaintiffs for themselves and on behalf of all farm workers in Texas. There is no dispute as to any material facts. Acting on cross-motions, the District Court, on December 21, 1971, granted the motion for summary judgment of the defendants, denied the motions of plaintiffs and intervenor-plaintiffs, and dismissed the action. This appeal followed.
 
 
 6
 The issues raised by the parties on appeal are three. (1) Can aliens commuting daily or seasonally to work in the United States without maintaining residences in this country enter the United States without immigrant visas and without a certification by the Secretary of Labor that (a) there is a shortage of domestic labor of the kind the aliens are to perform, and (b) their employment will not affect wages and working conditions of American workers? (2) Are most commuters properly classifiable as non-immigrants who therefore may not be admitted into the United States unless the Secretary of Labor determines that no domestic labor is available? (3) Does 8 C.F.R. Sec. 211.1(b)(1) (1972) permit commuters to enter the country to take employment where a labor dispute exists even if they previously have been employed there? Plaintiffs contend that the plain language of the statute and the lack of a consistent administrative practice regarding commuters dictate a decision in their favor. The defendants join the issues by contending that the alien commuter system is the product of a long-standing consistent administrative application of the immigration laws and that Congress has repeatedly ratified the existence of this practice.
 
 
 7
 The Court is convinced that the parties have drawn the issues too broadly and consequently have not focused upon a vital distinction in the history of daily and seasonal commuters.[3] The distinction between these two types of commuters coupled with their relevant histories dictate the differing treatment we have given each of these classes of commuters.
 
 I.
 
 8
 The administrative treatment by the Service of the seasonal commuter aspect of this overall problem makes appropriate a brief reference to the origin and history of the bracero program. Due to the unusual farm labor shortage in the United States during World War II, the United States and Mexico in 1943 initiated the bracero program to provide for the seasonal importation of Mexican agricultural workers.[4] In 1951, when Congress renewed the bracero program in Public Law 78, it strengthened provisions in the agreement in order to protect domestic labor.[5] Growers were required to make reasonable efforts to attract domestic workers prior to certification by the Department of Labor of the need for foreign labor. During the 1950's and early 1960's, the importation of Mexican agricultural workers under the bracero program increased markedly. Despite the added safeguards to protect American labor, there arose a growing concern in the country over the program's adverse impact on domestic labor. Congress in 1964 therefore decided to allow the program to lapse.
 
 
 9
 Soon after Congress ended the bracero program, it amended in 1965 the Immigration and Nationality Act of 1952, the basic statute, to provide "safeguards to protect the American economy from job competition and from adverse working standards as a consequence of immigrant workers entering the labor market."[6] The most important change was to strengthen the labor certification process. Section 212(a)(14) of the Immigration Act of 1952 had proved ineffective because an alien only could be excluded if the Secretary of Labor previously had certified that admittance of the alien would have an adverse effect on American labor. The Secretary had no way of knowing those who had applied to immigrate to the United States or their prospective occupations, residences, or employers. The 1965 amendments radically changed the certification procedure by reversing the burden of initiating the certification process. Under the new provision, an alien laborer cannot enter the United States unless the Secretary of Labor has certified that there is not enough domestic manpower available to perform such tasks and that his employment would not adversely affect the wages of American workers similarly employed. 8 U.S.C. Sec. 1182(a)(14) (1970).
 
 
 10
 Despite this background, the Service after the termination of the bracero program in 1964 created a new class of commuter-a "new immigrant," the seasonal worker.[7] The Service has admitted that the "seasonal worker is a person who came into being largely after the repeal of the bracero law," and that "many of them are former braceros who have been admitted to the United States temporarily for employment under" the Act.[8] Thus, while the daily commuter can work only within a relatively short automobile drive of the border, the seasonal commuter works in areas far inland in competition with a depressed and economically deprived work force of this country.
 
 
 11
 The metamorphosis of the bracero to seasonal commuter is directly inconsistent with Congress's purpose in ending the bracero program in order to eliminate its adverse impact on American workers. While the bracero program had many protections designed to protect domestic labor, the ex-bracero as a seasonal commuter enters and leaves the United States freely, subject to none of the many safeguards for domestic labor which characterized the bracero program prior to its termination in 1964. The fact that Congress has approved the continued existence of the daily commuter program is no indication that it has approved a program which circumvents explicit expressions of Congressional concern for American labor, is a short-lived invention of the Service and which flies in the face of traditional Congressional concern for the American working man.[9]
 
 
 12
 More specifically, the Service, in order to reach this result, has interpreted seasonal commuters as "returning resident aliens," a class of immigrant not required upon re-entry to obtain immigrant visas. 8 U.S.C. Sec. 1181(b) (1970). A returning resident alien is defined in the same Act as an "immigrant, lawfully admitted for permanent residence who is returning from a temporary visit abroad." 8 U.S.C. Sec. 1101 (a)(27)(B) (1970). The regulations amplify this definition by describing returning resident aliens as persons "returning to an unrelinquished lawful permanent residence in the United States after a temporary visit abroad." 8 C.F.R. 211.1(b)(1) (1972). As Judge Wright so persuasively pointed out in his dissenting opinion in the Gooch case,[10] the construction of "lawfully admitted for permanent residence" as including commuters "makes nonsense of the Congressional policy embodied in no fewer than five sections of the Act entirely apart from Sec. 1101(a)(27)(B), and is contrary to the plain meaning of two others." In short, seasonal commuters are improperly classified as "returning resident aliens" and are not entitled to the benefits of such classification. The Service's practice is in violation of the clear and plain language of the statute.
 
 
 13
 Aside from Congressional purpose and intent, we also find that seasonal commuters are properly to be classified as non-immigrants under the Act. Section 101(a)(15) of the Immigration and Nationality Act defines an immigrant as an alien not coming within ten categories of non-immigrants. 8 U.S.C. Sec. 1101(a)(15) (1970). A non-immigrant is there defined as-
 
 
 14
 "[A]n alien having a residence in a foreign country which he has no intention of abandoning . . . (ii) who is coming temporarily to the United States to perform temporary services or labor . . . ." (emphasis added) 8 U.S.C. Sec. 1101(a)(15)(H) (1970).
 
 
 15
 This provision reflects the intention of Congress in the Act of 1952 to differentiate carefully between immigrants coming to the United States for permanent residence and non-immigrants coming temporarily.[11] Congress, therefore, in Section 101(a)(15)(H) created a new class of non-immigrants coming temporarily to perform services or labor. The purpose of the provision was to allow the admission of certain workers to alleviate "labor shortages as they exist or may develop in certain areas or certain branches of American productive enterprises, particularly in periods of intensified production."[12]
 
 
 16
 Subsection (H) explicitly covers a person coming to this country to perform services or labor if both the visit and the service are temporary. Seasonal commuters reside in a foreign country which they have no intention of abandoning, and they come only temporarily to the United States. All commuters who work as agricultural laborers only during the agricultural season provide only temporary services or labor. Seasonal commuters involved in this case come clearly within that section.[13] The Service's practice of classifying seasonal commuters as "returning resident aliens" thus has no statutory warrant, is contrary to the intent of Congress, and is illegal.[14]II.
 
 
 17
 On the other hand, the daily commuter system dates from 1927, more than 45 years ago. Its historical origin stems from a border crossing system of the nineteenth and early twentieth centuries as a result of which aliens living in Canada and Mexico, as well as United States citizens living in the United States, were able to travel freely into the adjoining country for pleasure, for business or for employment. This border crossing system in its legal aspect can best be described as an informal reciprocal arrangement between the Government of the United States and the Governments of Canada and Mexico. In 1917, pursuant to a directive in the Immigration Act of that year to expedite travel to the United States from Canada and Mexico, the Service prescribed an identification card for the use of those who resided on either side of the border and habitually crossed the boundary for legitimate purposes. Between 1917 and 1927, aliens to whom identification cards had been issued enjoyed border crossing privileges as long as they were not barred by any qualitative exclusion provision of the 1917 Act.[15] These rules for border crossers continued unchanged until April, 1927.
 
 
 18
 The 1924 Act did not repeal or modify the basic 1917 Act but was expressly declared to be an addition to and not a substitution for the 1917 law.[16] The 1924 Act classified all arriving aliens as either immigrants or non-immigrants. An immigrant was defined as any alien destined to the United States except one within any of the six enumerated non-immigrant classes.[17] As a result, by 1927 the Service in General Order No. 86, had decided that aliens residing in foreign contiguous countries and entering the United States to engage in employment would thereafter be considered "immigrants" who must first be admitted for permanent residence.[18] Those who achieved such admission within a grace period were permitted to enjoy the border crossing privilege. Paragraph Five of the General Order provided that "[a]liens who have complied with the requirements of this General Order governing permanent admission will be considered as having entered for permanent residence." Thus, the daily commuter was born.
 
 
 19
 General Order No. 86 rested on the implied premise that the adaptation of the border crosser system to the Immigration Act of 1924 and its continued existence as the daily commuter system was in accord with the will of Congress. The 1924 Act had made no mention of border crossers as such. In the contemporaneous view of the administrative authorities it was plain, however, both from the statute itself and from its history, that Congress did not attempt to deal with the already long-standing border crossing system, and must not have intended to disturb it. In the 1924 Act, Congress was wholly preoccupied with restricting overseas immigration, particularly from certain countries in eastern and southern Europe. Meanwhile, the directive of the 1917 Act to facilitate border crossing remained on the statute books. Since then the Service has maintained control over the daily commuter system through administrative practice.
 
 
 20
 In 1952 the organic statute, the Immigration and Nationality Act, became law. This Act brought together the elements of both the 1917 and 1924 Acts and at the same time enacted certain new provisions. Daily commuters were not mentioned in the new law and its text and legislative history are silent on the subject. From this, the Service might well have concluded that it was the intent of Congress in the Act to permit alien commuters to continue to come to the United States in the same status they had enjoyed under the prior laws. Certainly, if Congress had intended with one stroke to outlaw the commuter system, thereby taking away the longstanding right of entry of aliens who had been admitted for permanent residence, there would have been some indication of such intent.[19]
 
 
 21
 In the light of the above history and administrative practice, it is fair to assume that the historic daily commuter practice known to Congress[20] was expected to continue unchanged in the 1952 law. Where an administrative practice has continued in existence for over 45 years and has consistently been extended in the light of various immigration Acts which have never expressed any mention or disavowal of the practice,[21] efforts to change or eliminate such a practice should be addressed to the Congress, not to the Courts.[22]
 
 
 22
 The Court is also mindful that the plaintiffs place reliance on the plain language of 8 U.S.C. Secs. 1181(b), 1101(a)(27)(B), and 1101(a)(20) (1970). The majority opinion in Gooch v. Clark, 433 F.2d 74, 78-81 (9 Cir. 1970), answers some of these contentions.[23] It should suffice to say that the statutory language is not as plain and unambiguous as plaintiffs contend.[24] Plaintiffs, for instance, make much of the contention that one living in a foreign contiguous country cannot be a "resident" of the United States. But the concept of permanent "residence" can be taken to include the place of work of a daily commuter crossing international boundaries, in the same sense that a person commuting daily to his business in New York City, where he has a permanent commitment and interest in the on-going vitality and soundness of the city, and where he may have, for example, fraternal and cultural associations, may well consider himself a New Yorker even though his home in the suburbs is located in New Jersey or Connecticut. Daily commuters are often fully integrated into the United States economy, including-particularly in the case of commuters from Canada-membership in United States unions, and supervisory positions in United States business enterprises. Thus, a daily commuter could be a resident of the United States within the plain language of the Act.
 
 
 23
 Finally, we are aware that the perpetuation of the daily commuter system is vital to the lives of thousands of daily commuters on both sides of our land borders. These individuals make important contributions to the economies of their respective cities, such as Windsor-Detroit, and reversal of the present practice would cause severe dislocation and hardship. In seeking an answer to the economic competition of ex-braceros who operate under the seasonal commuter system, plaintiffs seek the wholesale expulsion or exclusion from the United States of daily commuters who entered this country in reliance upon the immigration law as interpreted by the Service,[25] and despite the fact that they may have worked in this country for many years.[26]
 
 
 24
 Plaintiffs' request for relief is broader than is necessary to meet the burden of their complaint; they have used a broadsword, when a rapier would have been more appropriate. We are unwilling to disregard this long-standing administrative practice by ordering a change of such far-reaching consequences and affirm the action of the District Court as it relates to daily commuters.
 
 
 25
 Our disposition differs from that proposed in Gooch by either the majority or dissent. While we have rooted our disposition in the statute as it stands, we have been particularly mindful of the need for construction in the light of a genuinely long-standing administrative practice in regard to daily commuters, a practice that we are convinced Congress did not mean to scrap, so far as concrete results of admittance of daily commuters are concerned. As to the post-1964 practice of the Service in regard to seasonal commuters, it is not only recent in origin, but is so patently a jerry-built patchwork, a synthetic construct hastily assembled after the termination of the bracero program in obvious contradiction to the legislative intent, that it cannot be given serious consideration as a meaningful guideline for the interpretation of the statute.
 
 
 26
 Accordingly, this case is remanded for proceedings consistent with this opinion.
 
 
 27
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U. S.C. Sec. 291(a)
 
 
 **
 Sitting by designation pursuant to 28 U. S.C. Sec. 292(a)
 
 
 [1]
 Hereinafter referred to as the "Service."
 
 
 [2]
 Although the gravamen of the Complaint is directed solely toward the Mexican aspect of this problem, there is no gainsaying the fact that the same considerations are applicable to commuters from Canada
 
 
 [3]
 Daily commuters are persons, whose actual dwelling place in fact, without regard to intent, is in a foreign contiguous country, and who commute daily to work in the United States. Seasonal commuters are persons, whose actual dwelling place in fact, without regard to intent, is in a foreign contiguous country, and who come to the United States for extended periods to perform seasonal work. See generally 8 U.S.C. Sec. 1101(a)(33) (1970)
 
 
 [4]
 Agreement between the United States of America and Mexico respecting the temporary migration of Mexican agricultural workers, effected August 4, 1942, 56 Stat. 1759
 
 
 [5]
 Act of July 12, 1951, 65 Stat. 119
 
 
 [6]
 H.Rep.No.745, 89th Cong., 1st Sess. 18 (1965); S.Rep.No.733, 89th Cong., 1st Sess. 10 (1965)
 
 
 [7]
 The Government at oral argument admitted that at least until the 1952 Act, the number of commuters who arguably could be called seasonal was "inconspicuous."
 
 
 [8]
 Statement by James S. Hennessy, Executive Assistant to the Commissioner of the Service, at the Hearings on H.R. 12667, Employment of "Green Card" Aliens During Labor Disputes Before the Special Subcomm. on Labor of the House Comm. on Education and Labor, 91st Cong., 1st Sess. 73 (1969)
 
 
 [9]
 The Court does not read the Secretary of State's affidavit as directed to the seasonal commuter system. See infra footnote 26
 
 
 [10]
 Gooch v. Clark, 433 F.2d 74, 83 (9 Cir. 1970)
 
 
 [11]
 See H.Rep.No.1365, 82d Cong., 2d Sess., 36-37 (1952) U.S.Code Cong. & Admin. News 1952, p. 1653
 
 
 [12]
 Id. at 45, U.S.Code Cong. & Admin. News 1952, p. 1698
 
 
 [13]
 Subsection (H) does not apply to daily commuters who come to the United States to a steady job throughout the year. While such a commuter comes temporarily to the United States each day, the services he provides are not temporary
 
 
 [14]
 In view of our holding that seasonal commuters coming to the United States for the first time today must be considered as non-immigrants under Section 101(a) (15)(H), it is also plain that seasonal commuters who have previously come to the United States as immigrants admitted for permanent residence must now be considered as non-immigrants. The Service's error in considering them as immigrants cannot convert non-immigrant into immigrant status. The law is plain that each and every time an alien enters the United States, his entry must be legal as of that time. It is no longer sufficient that the alien legally entered the United States on prior occasions. Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 213, 73 S.Ct. 625, 97 L.Ed. 956 (1953); Bonetti v. Rogers, 356 U.S. 691, 698, 78 S.Ct. 976, 2 L.Ed.2d 1087 (1958). Consequently, when a seasonal commuter enters the United States today, the legality of his entry must be determined as of that time. Even if the seasonal commuter entered legally one or a score of times before as an immigrant his entry must be reevaluated. Since he is a non-immigrant, he must conform with the laws relating to non-immigrants
 For the purpose of identifying the class, which will be affected by our ruling re seasonal commuters, the Court notes that the Service considers seasonal workers who are present in the United States for over six months each year to be permanent alien residents of the United States despite the fact that their actual dwelling place in fact may be in a foreign contiguous country. Matter of Hoffman-Arvayo, - I. & N. - No. 2095 (Sept. 7, 1971); 1 Gordon & Rosenfield, Immigration Law and Procedure, Sec. 2.19 (1972 Supp.). The Government appears to have conceded that all commuters-with the exception of those commuters who live and work in the United States for more than six months each year-do not reside in the United States. This concession covers the large majority of seasonal commuters since most seasonal commuters stay in this country only for the harvest season, a period of four to six months depending on the crop. However, some commuters do stay over six months in the United States. It must be observed that these commuters also may be affected by the Court's ruling since the position of the Service in equating mere physical presence over the six months with residence in this country is without statutory or logical basis.
 The definition of residence received its present form in the 1952 Act. 8 U.S.C. 1101(a)(33) (1970). Prior to the 1952 Act, the Nationality Act of 1940 provided that "the place of general abode shall be deemed the place of residence." Sec. 104, 54 Stat. 1138. The 1952 Act tightened this definition by defining "the place of general abode" as a person's "principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. Sec. 1101(a)(33) (1970). Actual residence is not then synonymous with physical presence but is a question of fact to be determined in each case. See In Re Olan, 257 F.Supp. 884, 893 (S.D.Cal.1966); Petition for Naturalization of Castrinakis, 179 F. Supp. 444, 446 (D.Md.1959); Toy Teung Kwong v. Acheson, 97 F.Supp. 745, 747 (N.D.Cal.1951). If it is determined that workers coming seasonally to the United States for periods of over six months do in fact reside in a foreign contiguous country, they are seasonal commuters who fall within the framework of this decision.
 
 
 [15]
 See Act of February 5, 1917, Secs. 3, 23; 39 Stat. 875, 892
 
 
 [16]
 Immigration Act of 1924, Sec. 25; 43 Stat. 166
 
 
 [17]
 Id. Sec. 3, 43 Stat. 154-155
 
 
 [18]
 General Order No. 86, Bureau of Immigration, April 1, 1927
 
 
 [19]
 No mention of commuters is made in the 1965 amendments of the 1952 Act. Act of October 3, 1965, Pub.L. No. 89-236, 79 Stat. 911, amending 8 U.S.C. Sec. 1101 et seq. (1970)
 
 
 [20]
 See S.Rep.No.1515, 81st Cong., 2d Sess., 535-536, 616 (1950)
 
 
 [21]
 See Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States, 377 U.S. 235, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964). There concerning the reenactment rule, Mr. Justice Harlan, for a unanimous Court noted:
 "Some weight is due to the consistent interpretation of the Maritime Commission, the agency entrusted with administration of the statute. . . . The successive extensions by Congress of the Commission's authority . . . are certainly not controlling, particularly since it does not appear that Congress ever advertently addressed itself to the claim of invalidity . . .; they do, however, strengthen to some extent the Commission's conclusions . . . . Needless to say, these 'interpretative aids' neither singly nor in conjunction, could lead to an affirmance here if it were clear that the Commission's action contradicted the requirements of the . . . Act . . . However, they are consistent with, and lend support to, what we believe to be the most sensible view of the statutory framework."
 Id. at 241-242, 84 S.Ct. at 1241-1242. See also 1 Davis Administrative Law Treatise Sec. 5.07 (1958).
 
 
 [22]
 Legislation was introduced into the 92nd Congress which would profoundly affect the commuter system. See, e. g., S. 1373, 92d Cong., 1st Sess. (1971); S. 1488, 92d Cong., 1st Sess. (1971); H.R. 8746, 92d Cong., 1st Sess. (1971); H.R. 14831, 92d Cong., 2d Sess. (1972)
 
 
 [23]
 The Court in Gooch did not sharply distinguish daily from seasonal commuters
 
 
 [24]
 E. g., 433 F.2d at 78-79
 
 
 [25]
 See Texas State AFL-CIO v. Kennedy, 117 U.S.App.D.C. 343, 345, 330 F.2d 217, 219, cert. den. 379 U.S. 826, 85 S.Ct. 54, 13 L.Ed.2d 36 (1964)
 
 
 [26]
 Also involved are the Governments of Canada and Mexico. The Secretary of State, in an affidavit before the Court, has voiced the concern of these two neighboring countries at the possibility of a sudden judicial termination of the commuter system. In his considered judgment, such a change of policy would have "a serious deleterious effect" and "adversely affect" our relations with our two neighbors. Appendix at 52-54, Affidavit of Honorable William P. Rogers, Secretary of State of the United States, filed October 13, 1970. Although the Secretary for obvious reasons made no mention of the likelihood of an adverse response by Canada and Mexico against American nationals commuting daily to work in those two countries, the strong possibility of retaliatory measures by these countries requires no elaboration by us