**In re Petition for Naturalization of Brigitte Hedwig OLAN.**

**Petition No. 267502.**

United States District Court
S. D. California,
Central Division.

Aug. 15, 1966.

Bennet Olan, Beverly Hills, Cal., for petitioner.

Jack J. Gantwerk and Robert Griffin, designated examiners, Immigration and Naturalization Service, U. S. Dept. of Justice, Los Angeles, Cal., for Immigration and Naturalization Service.

## DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT AND ORDER

HAUK, District Judge.

Petitioner, a native of Czechoslovakia and alien citizen of Austria, seeks citizenship under Section 319(a) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1430(a).[1] In essence this permits the naturalization of the alien spouse who meets all other eligibility requirements if, after being lawfully admitted for permanent residence, she has resided in the United States for three years, has been physically present in this country for at least one half of this period, and has been living "in marital union" with the citizen spouse during the three years immediately preceding the filing of the petition.

After the filing of appropriate documents and an administrative hearing that was rendered abortive and virtually useless by the petulant and peevish obstructionism of petitioner's attorney (who is also her citizen spouse), the matter is now before this Court on final hearing, pursuant to 8 U.S.C.A. § 1447.

Conceding that petitioner has met all of the other requirements under the Act, the Government opposes citizenship and recommends denial for two reasons:

(1) Petitioner allegedly had *not* been living "in marital union" with her spouse during the three years immediately preceding the filing of the petition, in violation of Section 319(a) of the Act, 8 U.S.C.A. 1430(a); and

(2) Petitioner allegedly is *not* "a person of good moral character" as required by and within the meaning of Section 316(a) of the Act[2] because in stating under oath in various documents that she had been so "living or residing" with her spouse, she had "given false testimony" and falls within the proscription of Section 101(f) (6) of the Act, 8 U.S.C.A. 1101(f) (6) and can *not* be "regarded as a person of good moral character."[3]

The determination of these two issues, of course, depends upon the facts as well as the law. After thorough examination of both we proceed to our findings of fact, conclusions of law and judgment, all of which are in favor of petitioner, granting her petition and admitting her to citizenship.

### FACTS

Petitioner, now a housewife 31 years of age, was born in Prague, became a citizen of Austria, met her American native born citizen spouse and married him in Vienna in November 1958. She came to the United States a week later and has physically resided in Southern California since then except for a short three-week trip to Austria in the late summer of 1960.

1. "Sec. 1430(a) Any person whose spouse is a citizen of the United States may be naturalized upon compliance with all the requirements of this subchapter except the provisions of paragraph (1) of section 1427(a) of this title if such person immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least three years, and during the three years immediately preceding the date of filing his petition has been living in marital union with the citizen spouse, who has been a United States citizen during all of such period, and has been physically present in the United States for periods totaling at least half of that time and has resided within the State in which he filed his petition for at least six months."

2. "Sec. 1427(a) No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner * * * (3) during all the period referred to in this subsection has been and still is a person of good moral character, * * * *"

3. "Sec. 1101(f) For the purposes of this chapter—No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—(6) one who has given false testimony for the purpose of obtaining any benefits under this chapter; * * * *"

From December 1958 to July 1960 she worked as secretary to the Austrian Trade Delegate, Western United States, headquartered in Los Angeles; and since then to the present moment she has been housewife and mother of two youngsters both born in the United States and therefore native born citizens, a girl of five years and a boy of four.

In November 1959, petitioner and her spouse took up residence in a house at 14478 Glorietta Drive, Sherman Oaks, California, and at all times to the present moment this has been and still is the family home, domicile and residence, upon which the citizen spouse has made all payments and which is held in the joint names of petitioner and her spouse.

The life of petitioner and her spouse, like the living of most marital unions, has had its share of connubial spats and reconciliations. Prior to January 1965, on the occasion of two or perhaps three of these domestic quarrels, petitioner's spouse left the home for short periods, leaving virtually all of his clothes, books and other belongings at the home and returning in less than a week in each case.

On January 1, 1965, in what petitioner thought was just another of his temperamental outbursts and domestic tantrums (demonstrations, incidentally, that had what appear to the Court their counterparts in the spouse's temperamental outbursts and tantrums in the course of his activities in attempting to represent petitioner in this proceeding, both at the administrative level and in the courtroom), her spouse physically left the home again. Again, as on the prior occasions, he left the major portion of his clothes at home, along with virtually all of his own books and other belongings. Again, based on his past performance, petitioner earnestly and honestly believed that her spouse would return.

He continued to come to the home at least once a week to visit the children, to discuss the family finances, and occasionally to pick up an additional piece of clothing. And during that time there were discussions of reconciliation as there had been on the prior occasions. There is no doubt that petitioner fully expected him to return to the family home. But when he did not by the middle of April, and in order to bring matters to focus for discussion of realistic approaches to finances, property and reconciliation, she finally saw an attorney who filed a complaint for divorce on her behalf.

Up to the present moment, no further action has been taken in this suit and the complaint is the only effort either she or her spouse has made toward a divorce. As a matter of fact, petitioner's spouse has continued to supply petitioner and the family with all necessary funds for living expenses, including house payments.

During the entire time and up until four months ago, that is, until April 1966, both petitioner and petitioner's spouse honestly and in good faith considered that the family home was the actual residence, the home, the official living place, the place of general abode, the principal and actual dwelling place of both petitioner *and petitioner's spouse.* This was the place to which all of his mail—other than office mail—was sent. This was the address he used as his residence address. This was the place where he kept practically all of belongings and personal property except for his wearing apparel and his law office equipment. This was the address which he continued to give to the Registrar of Voters, and he actually voted from this address until he changed his registration when he re-registered to vote in April 1966 four months ago.

He did sleep elsewhere, it is true, in an apartment which he rented in February, 1965, at Brookside Country Club in Los Angeles. And he still does so. But, as confirmed by the Manager, he refused to sign a lease and has stayed there on a strictly month-to-month tenancy. And petitioner never did learn where her spouse was actually staying, because the only address she had for him other than the family home was his office. Apparently the first time she heard of the

Brookside Country Club apartment was at this final hearing in Court here today.

Under the circumstances it is clear, and the Court finds, that the Sherman Oaks family home was the actual residence, the home, the official living place, the place of general abode, the principal and actual dwelling place of both petitioner *and petitioner's spouse,* from November 1959 until at least April 1966, four months ago.

Finally, there is no question, and the Court finds, that at all times since November 1958 petitioner and her citizen spouse have been *validly and lawfully* married; that they are still married at the present moment; and that all of the rights, duties, privileges and obligations arising out of the marriage and thereto appertaining have been and still are in existence and in full force and effect as of this moment.

We now examine the contentions of the Immigration and Naturalization Service in contesting petitioner's citizenship and recommending its denial.

### FIRST ISSUE—"IN MARITAL UNION"

■ The Government contends that petitioner did not live with her spouse "in marital union" for the requisite three-year period immediately preceding the filing date of the petition (March 11, 1965), because of the fact that the spouse physically left the family home on January 1, 1965, and did not sleep there again. Put another way, it is urged by the Service that petitioner was not living "in marital union" with her spouse from January 1 to March 11, 1965, making a gap of two and one-half months in the statutorily required three-year period.

Only two cases have been found with any direct bearing upon the meaning and interpretation of 8 U.S.C.A. § 1430(a) and its phrase "in marital union." Petition for Naturalization of Omar, 151 F. Supp. 763 (S.D.N.Y., 1957), and Petition for Naturalization of Kostas, 169 F.Supp. 77 (D.Del., 1958).

In *Omar* the Court granted the alien wife's naturalization petition despite the objection of the Government which contended that a court-ordered separation, voluntarily agreed to by petitioner and her citizen husband, as a "cooling-off" period for both of them, somehow broke or interrupted the continuity of the marital union required by the statute. The Court held that this temporary physical separation no more interrupted the marital union than would a two-week vacation in the country for the wife or a two-week fishing trip for the husband. Relying upon the fact that the husband continued to supply the wife with living funds and stressing the testimony of both that there was no intent of any permanent separation, the Court concluded that there had been compliance with the statute so far as "marital union" was concerned.

In *Kostas,* on the other hand, the Court denied naturalization to an alien who claimed to have been married and living with a citizen wife. The evidence was overwhelming that he had not lived with the wife for as much as one year out of the three-year statutory period; his only address was his brother's home while his wife had an entirely different address; and disinterested neighbor witnesses testified to his living entirely alone as a single man throughout the entire three years. Without any reference to legislative history, the Court went on to find, from mere reading of Section 1430(a) a "Congressional expectation that a noncitizen spouse who lived in close association with a citizen spouse for three years would more speedily absorb the basic concepts of citizenship than one not so situated." 169 F.Supp. 77, 78. From this it deduced that the words "in marital union" should be given a "reasonably strict construction in order that the section should lead to an accomplishment of the desired objective." Then it concluded that while a relatively short separation of two weeks should not operate to destroy a petitioner's rights under the section, as was held in *Omar,* nevertheless "a close continued marital association is obviously intended." 169 F.Supp. 77, 78.

If these were the only authorities to which we could turn, the decision in the case at hand would seemingly read more closely on *Omar* than on *Kostas*. Here, as in *Omar,* we have a relatively short physical separation—two and one-half months out of the three-year statutory period and the five and one-half years of married life up until the filing of the petition; we have the husband continuing to supply the living funds of wife and family; and we have the testimony of both petitioner wife and citizen husband that there was no intent of permanent separation during the two and one-half months. In the words of *Omar,* "As far as this court has been able to discover, there is no requirement that husband and wife remain in the same house each day to constitute a continuance of the marital union" 151 F.Supp. 763, 764.

So much for case law directly in point. What about administrative interpretation? The only regulation bearing upon Section 319(a) of the Act, 8 U.S.C.A. § 1430(a), is found in 8 Code of Federal Regulations, Part 319, "Special Classes of Persons Who May Be Naturalized; Spouses of United States Citizens." But it is only a paraphrase of the statutory language, simply reiterating the phrase

"living in marital union." [4] We find no attempt by the Service to define the phrase.

Seeking legislative history of the phrase "in marital union", we find that the Immigration and Nationality Act of 1952 was enacted by the 82d Congress, 2d Session, in the form of the House Bill (H.R. 5678) with some changes by the Senate that were accepted by the Conference Committee of the two houses. We have examined the Report of the Judiciary Committee of the House of Representatives on this Bill (H.R. 5678), known as House Report No. 1365 of Feb. 14, 1952,[5] and the Conference Report No. 2096 of June 9, 1952.[6] But here again when we find discussion of the citizen-spouse exception to the general five-year residence rule, it is limited to a simple paraphrasing of the statutory language with reiteration of the phrase "in marital union." [7]

The Congressional Debates are of no help whatsoever. Nowhere throughout the extensive discussions in both House and Senate are there any references to the phrase "in marital union" or even to Section 319(a) of the 1952 Act.[8]

But the House Report does emphasize that the 1952 Act (H.R. 5678) "implements the underlying intention of our

---

4. "Sec. 319.1 Person living in marital union with United States citizen spouse.

"A person of the class described in Section 319(a) of the Immigration and Naturalization Act [8 U.S.C.A. 1430(a)] shall establish his good moral character, attachment to the principles of the Constitution of the United States, and favorable disposition to the good order and happiness of the United States for the period of three years immediately preceding the date of filing the petition and from that date to the time of admission to citizenship." 8 C.F.R. 319.1; 1953 (Vol. 2) U.S.Code Cong. and Adm.News, pp. 2439, 2628.

5. 1952 (Vol. 2) U.S.Code Cong. and Adm. News, pp. 1653–1753.

6. 1952 (Vol. 2) U.S.Code Cong. and Adm. News, pp. 1753–1756.

7. "The bill makes exceptions to the uniform 5-year residence rule in the case of spouses of citizens * * *

"(a) Spouses of Citizens.—The bill provides that spouses of citizens may be eligible for naturalization after 3 years' residence. Under existing law, the residence requirements for spouses of citizens vary from 1 to 3 years, depending on the date of the marriage. The bill requires that for one-half of the residence time the alien must have been physically present in the United States and must have lived in marital union with the citizen spouse during the entire 3-year period" House Report No. 1365, Feb. 14, 1952; 1952 (Vol. 2) U.S.Code Cong. and Adm.News, pp. 1653, 1737.

8. House Debate: April 23–25, June 10, 1952; 98 Cong.Rec. 4301, 4399, 4422, 4443.

Senate Debate: May 7, 22, June 11, 1952; 98 Cong.Rec. 4450, 4665, 4803, 5803, 5862, 6947, 7016, 7128, 7167, 8082, 8214, 8253.

**890**

immigration laws regarding the preservation of the family unit." [9] And speedy naturalization, as well as non-quota immigration, of the alien spouses of United States citizens has been a prime thrust of the statutory implementation of this Congressional intent to preserve the family unit. Thus the 1940 Immigration and Nationality Act which permitted the expeditious naturalization of the spouse of an American citizen after one, two or three years, respectively, depending upon the date of marriage,[10] now has its counterpart in the comparable provisions of § 319(a), 8 U.S.C.A. § 1430(a) of the 1952 Act, which sets up a uniform three-year period of residence and living in marital union.[11]

It is most significant that in construing the 1940 Act, which in Section 310 (a) used the phrase "existence of the marital relation" and in Section 311 used the phrase "resided in marital union", at least one Court interpreted the latter phrase to mean virtually the same thing as the former. In re Levine, 58 F.Supp. 622, 623 (D.Mass.1944). The clear holding is that by using the words "resided in marital union" in Section 311, Congress intended to make the *existence* of the marital union at the time of the filing of the petition a condition precedent.

This reasonable and sensible construction of the 1940 Act, making "marital union" practically synonymous with "existence of the marriage status", was followed in the two subsequent cases construing and enforcing the 1940 Act. Petition of Kelly, 61 F.Supp. 467, 467–468 (D.Oregon 1945) which approves Levine; Petition of Sam Hoo, 63 F.Supp.

439, 440 (N.D.Cal.1945) which reads "marital union" in Section 311 of the 1940 Act as "valid marriage."

No sound reason appears why we should not make the same sensible and practical construction of what is in reality the same phrase in the present statute. "Living in marital union" is not quite "residing in marital union." But to pretend they are not essentially the same is to ferret out a distinction without a difference. If the one phrase in the 1940 Act meant "existence of the marital union" and "valid marriage", then the other phrase in the 1952 Act means the same thing. At least we so hold.

■ Should we desire to probe to fundamentals we have the dictionary definitions at hand:

*Marital:* Of or pertaining to marriage; matrimonial; connubial.[12] Relating to or connected with the status of marriage.[13]

*Union:* A uniting; combination; fusion; marriage.[14]

A joinder of separate entities.[15]

From these we can only conclude that "living in marital union" means simply living in the status of a valid marriage. This construction is in full conformity with California law defining marriage and the marital rights and duties that arise out of and are founded in this personal relationship or status.[16] There is a clear distinction between the ordinary construction of the term "marital relations", and the conjugal rights of married persons which "include the enjoy-

9. House Report No. 1365, Feb. 14, 1952; 1952 (Vol. 2) U.S.Code Cong. and Adm. News, pp. 1653, 1680.

10. Sections 310(a), 311 of the 1940 Act; 8 U.S.C.A. §§ 710(a), 711 repealed by the 1952 Act, but which contained the phrases "existence of the marital relation" and "resided in marital union."

11. Section 319(a) of the 1952 Act; 8 U.S.C.A. § 1430(a).

12. Webster New International Dictionary (2d ed. Unabridged 1958); Webster New

World Dictionary (1962); Oxford English Dictionary (1933).

13. Black's Law Dictionary (4th ed. 1951); 26 Words & Phrases p. 733.

14. Webster New World Dictionary (1962); Webster New International Dictionary (2d ed. Unabridged 1958).

15. Black's Law Dictionary (4th ed. 1951).

16. California Civil Code, Section 55; Sharon v. Sharon, 75 Cal. 1, 9, 16 P. 345 (1888); Kilburn v. Kilburn, 89 Cal. 46, 50, 26 P. 636 (1891).

ment of association, sympathy, confidence, domestic happiness, the comforts of dwelling together in the same habitation, eating meals at the same table, and profiting by the joint property rights as well as the intimacies of domestic relations." [17]

Surely, preservation of the family unit should be our touchstone in construing the phrase "in marital union." And just as surely our inquiry should begin and end with a valid marriage, entered into and begun in good faith, and still continuing and in existence as a legal status.

By contrast, where would the necessity of finding "close continued marital association" as suggested by Kostas (169 F.Supp. 77, 78) lead us? Or where the even more intimate testing asked by the Government in the present case? Would the soldier in Viet Nam have to justify his one- or two-year absence from the family home so his alien spouse could be naturalized? And if not, then what about the mountain climber on a twelve-month expedition to Mt. Everest? And if not, would the importer on his annual three-month European buying trip have to explain? And if not, then why demand explanation from the two and one-half month absentee spouse who stays away from home because of a family spat? Are they not, each and every one of them, "living in marital union" equally as well or as much as each and every other one? That is unless resort is made to intimate, Kinsey-like testing techniques, hoping to find "close continued marital association."

How utterly insufferable would be the inquisitions, how unbearable the questionings, how intolerable the snoopings—into hall, living room, kitchen, bedroom and bath. Dare we force open the family home to pointless probings in parlor, morbid meanderings throughout the menage, candid camera shots of connubial curiosa?

Not that the dedicated examiners of the Immigration and Naturalization Service would do this or have done it here. Quite the contrary—they have been scrupulously correct in this case, even in the face of the irritating and insolent behavior of petitioner's counsel and husband. But neither they, nor the Court, nor the possibly less scrupulous successors or incumbents of the offices they and we now hold, should be permitted or even tempted to open up lines of insidious inquiry, resulting in invidious invasions of the intimacy and the integrity that are the indispensable insulations of marriage and the family unit.

Let us look at it another way. Suppose a marital spat between alien wife and citizen spouse. The husband takes his sports gear and goes fishing for two or three or four months in Canada or New Zealand; or skiing in Europe; or just loafing and painting in Tahiti. Does this mean neither husband nor wife is "living in marital union?" Or the wife takes the baby and enough gear for a two or three month stay and packs self and baby off to mother? Again, can it be said that the "living in marital union" has ended?

Obviously not. The status continues; marriage continues; the marital union continues; all rights, all duties, all obligations, all responsibilities of the marital union continue. They do not die, they cannot end—the marital union itself does not die and it cannot end—until there has been an end to the status by death or by judgment and decree of court, which in California is and must be a final decree of divorce.

■ Neither the mere filing of the complaint without more, as here; nor the moving from the home physically by the husband, as here; nor even the suspension of connubial intercourse and customary marital interchange, as here—can end the marital union.

By precedent in the *Omar* [18] and *Kostas* [19] cases construing the 1952 Act, by logical extension of the cases construing

17. Hawkins v. Hawkins, 104 Cal.App. 608, 612, 286 P. 747, 748 (3d App.Dist.1930).

18. 151 F.Supp. 763 (S.D.N.Y.1957).

19. 169 F.Supp. 77 (D.Del.1958).

the comparable provisions of the 1940 Act,[20] by the absence of any administrative rule, regulation, practice or interpretation, by the lack of definitive legislative history except the Congressional desire to preserve the family unit here where petitioner is the only alien in a family with native born citizen children and spouse, by plain reading of the statutory language, by the standards of lexicographers, by logic and by common sense, it appears and the Court finds as a fact that petitioner at all times, from a date at least three years immediately preceding the filing of her petition herein on March 11, 1965, to and including March 11, 1965, and continuing to the present time, has been and is living in marital union with her citizen spouse within the meaning and requirement of Section 319(a) of the 1952 Act, 8 U.S. C.A. § 1430(a). The entire family unit may not be saved and possibly the citizen spouse's departure by final divorce would help the remaining members. But at least mother and children will be united in common American citizenship, a classic application of the Congressional intent to preserve the family which, of course, would be enhanced by the dropping of the divorce suit, but which will be implemented even if the suit goes on to final decree.

## SECOND ISSUE: FALSE TESTIMONY—GOOD MORAL CHARACTER

█ The Government contends that petitioner gave false testimony consisting of certain statements made under oath in documents submitted or obtained during the naturalization proceeding. Let us examine them, four in all, by exhibit number, title of document, and exact quotation of statement:

*Exhibit* 1: APPLICATION TO FILE PETITION FOR NATURALIZATION (I & N Form N–400)

"(2) My present place of residence is 14478 Glorietta Dr., Sherman Oaks, Los Angeles, Calif."

"(6) I am married; the name of my husband is Bennet Olan * * * he * * * now resides with me."

(Signed and sworn to March 11, 1965)

*Exhibit* 2: PETITION FOR NATURALIZATION (I & N Form N–405)

"(2) My present place of residence is 14478 Glorietta Dr., Sherman Oaks, Los Angeles, Calif."

"(6) I am married; the name of my husband is Bennet Olan * * * he * * * now resides at w/me."

(Signed and sworn to March 11, 1965)

*Exhibit* 3: COMPLAINT FOR DIVORCE (Filed Los Angeles Superior Court, April 20, 1965)

"VII. Plaintiff petitioner herein and Defendant Bennet Olan, separated on or about January 1, 1965, and ever since said date have not lived together as husband and wife, or at all." (Verification signed April 14, 1965)

*Exhibit* 4: AFFIDAVIT (I & N Form I–315)

"I have lived at 14478 Glorietta Drive, Sherman Oaks, Calif., continuously since November 1959; I live at that address with my husband, Bennet Olan, and our two children Karen and David."

(Signed and sworn to July 22, 1965)

Before taking up these alleged false statements in detail it might be well to note here that all of the witnesses who testified in Court confirmed the high moral qualities and good character of petitioner, her attachment to the principles of the Constitution of the United States, and her good disposition to the good order and happiness of the United States.

One witness was particularly impressive—Dr. Eckard Paul Imhof, the Austrian Trade Delegate, Western United States, and present head of the office where petitioner was a secretary from

20. In re Levine, 58 F.Supp. 622 (D.Mass. 1944); Petition of Kelly, 61 F.Supp. 467 (D.Oregon 1945); Petition of Sam Hoo, 63 F.Supp. 439 (N.D.Cal.1945).

1958 to 1960. Dr. Imhof, the Court takes judicial notice, is a high ranking official of the Austrian Government, representing its "Bundeswirtschaftskammer", that is, Department of Commerce or Board of Trade, in the Western United States. He is a graduate of the University of Vienna Law School; he has known petitioner personally for fifteen years; and he has been a friend of her family as long as he can remember. Dr. Imhof vouched for her good background, her excellent moral character and his absolute trust in her veracity. Additionally he pointed out that in Austria one's residence is established by registration with the police, and this is the dwelling place and address for mail, tax forms, voting and all the other rights and obligations flowing from domicile.

The Court also had the advantage of observing petitioner on the witness stand under oath. Her truthfulness and honesty were immediately apparent. She is not by any stretch of the imagination a perjurer, not by character, nor by inclination, nor by fact.

Exhibits 1 and 2 merely state—in printed words with boxes for insertion of an "X" and not in her own language— that as of March 11, 1965, her husband resided at the family home. That statement was true in fact in March 1965, as the Court has already found. And she honestly believed it to be true. Not only does it conform to the Austrian idea of "residence" as testified to by Dr. Imhof, but it conforms to the definition of "residence" in Section 101(a) (33) of the Immigration and Nationality Act of 1952:

> "The term 'residence' means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C.A. § 1101(a) (33)

■ This definition is but a codification of judicial constructions of the term "residence" by the Supreme Court, and is not synonymous with physical presence which may but need not be factually present to constitute residence. Petition for Naturalization of Castrinakis, 179 F. Supp. 444, 445–446 (D.Md.1959).

Nor does Exhibit 3, the Complaint for Divorce, contain any false statement. There is no doubt in the mind of the Court, from all the evidence, that petitioner and her spouse separated on or about January 1, 1965, and ever since said date until April 14, 1965, "did not live together as husband and wife, or at all," within the customary jargon of divorce complaints in Los Angeles County Superior Court. And so the statement in the Divorce Complaint is true.

And finally Exhibit 4 does not contain a false statement either. In saying on July 22, 1965 that she lived at the Sherman Oaks address with her husband and the two children, petitioner was making no representation other than a truthful one, namely, that her husband still had the family home as his general abode, his principal, actual dwelling place, his residence. The factual basis for this we have already laid out in detail.

The facts are, and the Court so finds, that petitioner did not give any false testimony in any of the said exhibits or otherwise; that she was and is a person of good moral character; and that she has done nothing to disqualify her or bar her from citizenship. The activities of her husband when appearing as her attorney, irritating and abrasive as they undoubtedly were throughout this proceeding, were certainly not hers. Nor should she be blamed for them. And her good fortune in attaining citizenship in this Court is in essence her victory in spite of him, certainly not because of him.

## CONCLUSIONS OF LAW

From the foregoing facts and discussion the Court concludes that:

(1) Petitioner has established her eligibility for citizenship and naturalization under all pertinent sections of the Immigration and Nationality Act of 1952, including Section 319(a) thereof, 8 U.S.C.A. 1430(a), and more particularly she has lived in marital union with her citizen spouse during

894

the three years immediately preceding the date of filing her petition herein, to wit, March 11, 1965, all as required by said Section 319(a) and within the meaning thereof.

(2) Petitioner has established her good moral character under all pertinent sections of the Immigration and Nationality Act of 1952, including Section 316(a) thereof, 8 U.S.C.A. § 1427 (a), and more particularly she is a person of good moral character as required by said Section 316(a) and within the meaning thereof.

(3) Petitioner has established that she has not given any false testimony or in any other way said or done anything which would preclude her from citizenship and naturalization under or by reason of 101(f) (6) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1101(f) (6), or any other section of said Act.

(4) Petitioner is entitled to the judgment and order of this Court granting her petition for naturalization and admitting her to citizenship.

The foregoing shall and does constitute the Decision, Findings of Fact and Conclusions of Law herein, as required by Rule 52, Federal Rules of Civil Procedure. See also Application of Murra, 166 F.2d 605, 607 (C.C.A. 7th 1948).

The petition herein is granted and the clerk is ordered to administer to petitioner the oath of allegiance required by the naturalization laws and regulations.

Whereupon, the petitioner having taken the said oath of allegiance, the Court hereby makes the following Judgment and Order, which the clerk is ordered to file and enter as of this date of August 15, 1966:

JUDGMENT AND ORDER GRANTING PETITION FOR NATURALIZATION (ORDER No. 2359)

Upon consideration of the petition of Brigitte Hedwig OLAN for naturalization, recommended by the Immigration and Naturalization Service to be denied, listed on List No. 2359, sheet One, dated August 15, 1966, presented in open Court this 15th day of August, 1966, and the evidence herein; and based upon the Decision, Findings of Fact and Conclusions of Law heretofore made,

IT IS ORDERED that the recommendation of the designated examiner is disapproved as to the said petition listed below, and said petitioner so listed having appeared in person in open Court this 15th day of August, 1966, and having taken the oath of allegiance required by the naturalization laws and regulations,

IT IS FURTHER ORDERED that she be, and hereby is, admitted to become a citizen of the United States of America.