Wade V. CARTER, Jr., et al., Appellants,

v.

PANAMA CANAL COMPANY.

No. 24464.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1971.

Decided June 5, 1972.

Mr. Charles Sovel, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, for appellants. Messrs. A. Fred Freedman, Washington, D. C., and Abraham E. Freedman, New York City, were on the brief for appellants. Mr. Eugene G. Horowitz, Washington, D. C., also entered an appearance for appellants.

Mr. A. Raymond Randolph, Jr., Atty., Dept. of Justice, of the bar of the Supreme Court of California, pro hac vice, by special leave of Court, with whom Mr. L. Patrick Gray, III, Asst. Atty. Gen., Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for appellee. Messrs. Reed Johnston, Jr., and Robert L. Kopp, Attys., Dept. of Justice, also entered appearances for appellee.

Before ROBINSON and MacKINNON, Circuit Judges, and GOURLEY,* Senior District Judge for the Western District of Pennsylvania.

MacKINNON, Circuit Judge:

Appellants, towing locomotive operators employed by the Panama Canal Company, brought this class action for overtime pay pursuant to 5 U.S.C. § 5544 [1] on behalf of themselves and their

---

* Sitting by designation pursuant to 28 U. S.C. § 294(d) (1970).

1. 5 U.S.C. § 5544(a) contains the basic provisions for payment of overtime to federal "wage board" employees. It provides:

(a) An employee whose basic rate of pay is fixed and adjusted from time to time in accordance with prevailing rates by a wage board or similar administrative authority serving the same purpose is entitled to overtime pay for overtime work in excess of 8 hours a day or 40 hours a week. However, an employee subject to this subsection who regularly is required to remain at or within the confines of his post of duty in excess of 8 hours a day in a standby or on-call status is entitled to overtime pay only for hours of duty, exclusive of eating and sleeping time, in excess of 40 a week. The overtime hourly rate of pay is computed as follows:

(1) If the basic rate of pay of the employee is fixed on a basis other than an annual or monthly basis, multiply the basic hourly rate of pay by not less than one and one-half.

(2) If the basic rate of pay of the employee is fixed on an annual basis, divide the basic annual rate of pay by 2,080, and multiply the quotient by one and one-half.

(3) If the basic rate of pay of the employee is fixed on a monthly basis, multiply the basic monthly rate of pay by 12 to derive a basic annual rate of pay, divide the basic annual rate of pay by 2,080, and multiply the quotient by one and one-half.

An employee subject to this subsection whose regular work schedule includes an 8-hour period of service a part of which is on Sunday is entitled to additional pay at the rate of 25 percent of his hourly rate of basic pay for each hour of work performed during that 8-hour period of service. Time spent in a travel status away from the official duty station of an employee subject to this subsection is not hours of work unless the travel (i) involves the performance of work while traveling, (ii) is incident to travel that involves the performance of work while traveling, (iii) is carried out under arduous conditions, or (iv) results from an event which could not be scheduled or controlled administratively.

The Supreme Court in United States v. Townsley, 323 U.S. 557 (1945) held the predecessor provision to Section 5544 in the Federal Employees Pay Act applicable to Panama Canal Company employees, and the parties have stipulated that the appellants are "wage board" employees within the meaning of Section 5544.

fellow operators. They appeal from an order of the District Court,[2] following trial, dismissing their complaint on the alternative grounds that their action was precluded by the Portal-to-Portal Act of 1947,[3] or that the time periods involved were so short as to fall within the *de minimis* rule noted by the Supreme Court in Anderson v. Mt. Clemens Pottery Company.[4] Since we concur that the Portal-to-Portal Act applies here, we affirm the order of the District Court on that basis without reaching the question of the application of the *de minimis* rule.

## I

In each of the three lockage areas of the Panama Canal vessels transiting the locks are guided and assisted by electrical towing locomotives moving along the walls of the lock chamber. Appellants here are operators of these locomotives.

The Canal is never closed, so the operators work eight-hour shifts that begin and end with the relief on the locomotive itself of the operator who worked the prior shift. Since any locomotive might be at any point along the chamber wall at the end of a shift, and since the operators are not permanently assigned to a specific locomotive, each shift begins with each operator checking an assignment board located near the gate to the lockage area to learn which locomotive he is to operate and where it can be found. He must then walk to the locomotive and be ready to assume control when the shift begins. Depending on the lockage area and the distance of the locomotive from the gate at that particular time, this entire process, including the walk to the locomotive can take as little as two minutes or as much as fifteen minutes. In order to assure that the operators are on their assigned locomotives at the beginning of the shift, the Company expects them to check in at the lockage area gate sufficiently ahead of the time their shift begins to enable them to note the assignment board and walk to their assigned locomotive.[5] Operators are not required to punch a time clock and no formal time record is kept of the time they report and are relieved.

For several years prior to the initiation of this suit, appellants unsuccessfully attempted to persuade the Company that they were entitled to compensation for the time spent in checking the as-

2. Carter v. Panama Canal Co., 314 F. Supp. 386 (D.D.C.1970) (Corcoran, J.).

3. May 14, 1947, ch. 52, 61 Stat. 84, as amended, 29 U.S.C. §§ 251–262 (1970).

4. 328 U.S. 680, 692, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946).

5. The District found that:
   There is no requirement that an operator report to the assignment board. The only requirement is that he report to his duty station (his locomotive) by the time his shift begins. However, since the assigned locomotive may be located the maximum distance from the assignment board, *the operator of necessity must check the board at least 15 minutes before the start of his eight hour shift* to arrive at his locomotive on time.
   314 F.Supp. at 387 (emphasis added). Appellants urge that this finding that there is "no requirement" to report early "was against the weight of overwhelming evidence to the contrary . . . ." Brief for appellants, at 5. The evidence cited does not reveal any formally published regulation or requirement, but rather an informal expectation on the part of both the operators and Company officials that the operators would report early enough to check the assignment board and get to their locomotives. This expectation thus seems to fall within the common rubric of "an established custom or practice" made necessary by the requirement to be on the locomotive at the start of the shift (see emphasized portion of finding) rather than a formal requirement to report early. At any rate, the existence *vel non* of such a requirement would not affect our determination, of the case; the critical factor for that determination is the requirement to be present on the locomotive, prepared to begin the operators' "primary duties" at the start of the shift.

signment board and walking to the locomotives from the gate. Since they work a full eight-hour shift on the locomotive,[6] this extra time would have to be compensated at overtime rates. The issue in this suit is whether the operators are entitled to overtime compensation pursuant to 5 U.S.C. § 5544 for the time spent in checking the assignment board and walking to their locomotives.

## II

The basic legal problem confronting us on this appeal is the reconciliation of two closely related but separate bodies of federal legislation concerning employment compensation. In the Fair Labor Standards Act of 1938 (FLSA),[7] as amended and as modified by the Portal-to-Portal Act of 1947, Congress has enacted an extensive scheme of regulation of wages and hours to govern a broad portion of the private employment relationships in the United States.[8] Through an even more complex body of legislation, of which Section 5544 is only a small part, Congress explicitly provides for the compensation and regulation of the terms of employment of various groups of employees of the Federal Government. Since the enactment of FLSA, both Congress and the courts have often looked to that body of employment regulations for guidance in analyzing and interpreting similar provisions in the complex of regulations governing federal employ-

ment. We continue that process here and conclude that the congressional policies behind the two acts require that the Portal-to-Portal Act provisions should apply to these federal wage board employees.

### A. The Relationship of the Fair Labor Standards Act and the Portal-to-Portal Act

There is little room for question that if the Panama Canal Company were a private employer meeting the jurisdictional requirements of the FLSA,[9] the appellants' suit would be precluded by the Portal-to-Portal Act. If the Company were covered by the FLSA, the locomotive operators would be entitled to the protection of Section 7(a):

[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a) (1) (1970). The hours to be included in any "workweek" receive only a limited, exclusionary definition in the statute, 29 U.S.C. § 203(o) (1970), so the initial question would be whether the time spent in checking the assignment board and walking to the locomotives constituted part of the "workweek." In Anderson v. Mt. Clemens Pot-

6. Actually, the Company has long acquiesced in the practice of permitting the relieved operators to leave the locomotive at the time of their relief. Thus, if the oncoming operator relieves him on the locomotive before the beginning of the shift, the relieved operator is permitted to leave the lockage area as much as 20 minutes before the end of his shift. This early relief practice is indicative of the informal timekeeping practices of the Company. In this regard the District Court found: "Prior to January 1, 1968, locomotive operators were required to check in and out with a timekeeper at the main gate of the lock area *merely for the purpose of determining their presence in the lock area, not for the purpose of timekeeping.*" 314 F.Supp. at 388 (emphasis added). Since

1968, even that practice has been discontinued, and the operators merely check in with the security guard at the gate and mark their own name on the assignment board.

7. June 25, 1938, ch. 676, 52 Stat. 1060, as amended, 29 U.S.C. §§ 201–219 (1970).

8. The Fair Labor Standards Amendments of 1966, Pub.L. 89–601, 80 Stat. 830, were expected to extend FLSA coverage to 35.4 million of the estimated 47 million privately employed workers in America.

9. These requirements include meeting the definitions of 29 U.S.C. § 203 for an employer engaged in interstate commerce, but not falling within any of the specific exemptions of 29 U.S.C. § 213.

tery Company, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), the famous case that launched the Portal-to-Portal legislation, the Supreme Court was called upon to determine this question in a factual setting quite similar to the present case, and they found:

> Since the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace, the time spent in these activities must be accorded appropriate compensation.
>
> . . . . [T]he time necessarily spent by the employees in walking to work on the employer's premises, following the punching of the time clocks, was working time within the scope of § 7(a). . . . Such time was under the complete control of the employer, being dependent solely upon the physical arrangements which the employer made in the factory. Those arrangements in this case compelled the employees to spend an estimated 2 to 12 minutes daily, if not more, in walking on the premises. Without such walking on the part of the employees, the productive aims of the employer could not have been achieved. The employees' convenience and necessity, moreover, bore no relation whatever to this walking time; they walked on the employer's premises only because they were compelled to do so by the necessities of the employer's business. In that respect the walking time differed vitally from the time spent in traveling from workers' homes to the factory. . . . It follows that the time spent in walking to work on the employer's premises, after the time clocks were punched, involved "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." . . . Work of that character must be included in the statutory workweek and compen-

sated accordingly, *regardless of contrary custom or contract.*

328 U.S. at 690–692, 66 S.Ct. at 1194 (citations omitted) (emphasis added). It is clear to us that this test of the "workweek" would encompass the activities of the locomotive operators bringing the present action.

The congressional reaction to the *Mt. Clemens Pottery* decision was strong and quick, resulting in passage of the Portal-to-Portal Act at the very next session of Congress less than a year later. Focusing on the final clause of the quoted portion of the decision, Congress found

> that the Fair Labor Standards Act of 1938, as amended, has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, . . . a substantial burden on commerce and a substantial obstruction to the free flow of goods in commerce [would result].

Portal-to-Portal Act of 1947, § 1(a), 29 U.S.C. § 251(a) (1970).

The operative provisions of the Portal-to-Portal Act which reversed the *Mt. Clemens Pottery* decision are:

> (a) Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the [FLSA] . . . on account of the failure of such employer to pay an employee . . . overtime compensation, for or on account of any of the following activities of such employee . . .
>
> > (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
> >
> > (2) activities which are preliminary to or postliminary to said principal activity or activities.

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time . . . at which he ceases, such principal activity or activities.

(b) Notwithstanding the provisions of subsection (a) of this section . . . the employer shall not be [relieved from liability] if such activity is compensable by either—

(1) an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or

(2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity . . . .

*Id.* § 4, 29 U.S.C. § 254 (1970).

■ The "principal activity" of the appellants is the operation of the towing locomotives and the "actual place of performance" of this activity is the locomotive itself. Checking in at the assignment board is an activity "preliminary to" that "principal activity," and the daily walk to the locomotive certainly constitutes "walking . . . to . . the actual place of performance of the principal activity." In addition, there is neither "an express provision of a written or nonwritten contract in effect," nor "a custom or practice in effect" under which the operators were being paid for these activities. Accordingly, we find that if the Canal Company were a private employer subject to the FLSA, the Portal-to-Portal Act would block the locomotive operators' attempt

to recover overtime compensation for the time spent in checking the assignment board and walking to the locomotives prior to the commencement of their "principal activity" in operating the locomotives.

B. *Applicability of the Fair Labor Standards Act and Portal-to-Portal Act to Federal Employees*

■ As initially enacted, the FLSA expressly excluded all employees of the Federal Government from its coverage.[10] In recent years, however, there has been a growing congressional concern to ensure that federal employees do not lose, in the maze of statutory and regulatory provisions governing government employment, the advantages of basic compensation principles developed within the private employment sector. One of the most dramatic expressions of this concern was passage of the Federal Salary Reform Act of 1962[11] that contained, *inter alia*, a statement of congressional policy that "Federal salary rates shall be comparable with private enterprise salary rates for the same levels of work."[12] The principle of "comparability" with salaries of private enterprise, first expressed in this Act, has since motivated three specific statutory provisions involved in this action. It is from these statutes, and their legislative history, that we derive our conviction that the Portal-to-Portal Act applies to the claim that appellants make here.

1. *The Fair Labor Standards Amendments of 1966.*

The District Court relied principally on Section 306 of the Fair Labor Standards Amendments of 1966 for its finding that the Portal-to-Portal Act applies to these locomotive operators.[13] This

---

10. This was accomplished by means of the statute's definition of the term "employer," which definition remains in the Act today: "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States . . . ." FLSA § 3(d), 52 Stat. 1060, 29 U.S.C. § 203(d) (1970).

11. October 11, 1962, Pub.L. 87–793, Part II, 76 Stat. 841.

12. Federal Salary Reform Act of 1962, Pub.L. 87–793, Part II, Title I, § 502 (b), 76 Stat. 841 (with minor revisions now codified at 5 U.S.C. § 5301(a) (3) (1970)).

13. Fair Labor Standards Amendments of 1966, Pub.L. 89–601, Title III, § 306, 80 Stat. 841:

Sec. 306. Section 18 of such Act is amended by inserting "(a)" immediate-

provision added a new subsection to the FLSA that explicitly brought federal wage board employees and two other classes of federal employees within the minimum wage and overtime compensation requirements of the FLSA. Appellants argue that this amendment should be construed narrowly. They quote a sentence from the Senate Report on the bill, that "[t]his provision has been added to the act to affirm that no employee of the Federal Government . . . should receive compensation at rates less than those prescribed by the Federal act for private employment," [14] as standing for the proposition that only the imposition of a minimum floor for federal wages was intended. They argue that the Portal-to-Portal Act is one of the "other provisions of the act" to which

this amendment was intended not to be subject.[15] We find no such intent to exempt the federal employees brought within the coverage of the FLSA by this amendment from the effect of the Portal-to-Portal Act on their rights to overtime compensation. Rather, we find in the legislative history of the amendment a clear indication that Congress intended to apply the principle of comparability —including an explicit attempt to bring the compensation of these federal employees in the Canal Zone within the same body of regulation as is applicable to private enterprise employees in that jurisdiction.

In 1965 congressional hearings were begun in both houses on a myriad of separate bills to amend the FLSA both to extend its coverage and to raise the mini-

---

ly after "Sec. 18." and by adding at the end thereof the following new subsection:

"(b) Notwithstanding any other provision of this Act (other than section 13(f)) or any other law, any employee—

"(1) described in paragraph (7) of section 202 of the Classification Act of 1949 (5 U.S.C. 1082(7)) whose compensation is required to be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates, and any Federal employee in the Canal Zone engaged in employment of the kind described in such paragraph (7), or

"(2) described in section 7474 of title 10, United States Code, whose rates of wages are established to conform, as nearly as is consistent with the public interest, with those of private establishments in the immediate vicinity, or

"(3) employed in a nonappropriated fund instrumentality under the jurisdiction of the Armed Forces,

shall have his basic compensation fixed or adjusted at a wage rate which is not less than the appropriate wage rate provided for in section 6(a) (1) of this Act (except that the wage rate provided for in section 6(b) shall apply to any employee who performed services during the workweek in a work place within the Canal Zone), and shall have his overtime compensation set at an hourly rate not less than the overtime rate provided for in section 7(a) (1) of this Act."

A technical amendment in 1967 incorporated the first portion of subsection (b)

(1) of Section 18 into the general federal wage board employee pay provision, 5 U.S.C. § 5341(a), and deleted subsection (b) (2) to conform to the repeal of the statute creating the class of employees covered there. Act of September 11, 1967, Pub.L. 90–83, § 8, 81 Stat. 222. As so amended, 29 U.S.C. § 218(b) now reads:

(b) Notwithstanding any other provision of this chapter (other than section 213(f) of this title) or any other law—

(1) *any Federal employee in the Canal Zone engaged in employment of the kind described in section 5102(c) (7) of Title 5* or

(2) any employee in a nonappropriated fund instrumentality under the jurisdiction of the Armed Forces, shall have his basic compensation fixed or adjusted at a wage rate that is not less than the appropriate wage rate provided for in section 206(a) (1) of this title (except that the wage rate provided for in section 206(b) of this title shall apply to any employee who performed services during the workweek in a work place within the Canal Zone), and *shall have his overtime compensation set at an hourly rate not less than the overtime rate provided for in section 207(a) (1) of this title.* (Emphasis added.)

14. S.Rep. No. 1487, 89th Cong., 2d Sess. 22 (1966), U.S.Code Cong. & Admin.News, 1966, p. 3024.

15. *Id.* at 34.

mum wage rate.[16] In the early stages of the House hearings, during the testimony of Secretary of Labor Wirtz, Representatives James Roosevelt and Augustus Hawkins raised the question of federal payment of wages below the FLSA's minimum rates:

> Mr. ROOSEVELT. . . . I am shocked by the fact that the Government itself violates this principle of minimum wages as much as anybody else. . . .
>
> It is our understanding that civilian contractors with the U.S. Government can pay less than a minimum wage if they are not covered by the [FLSA] or the Davis-Bacon Act or the Walsh-Healy Act. This means that the United States can be a party to the payment of a subminimum wage.
>
> Now, for the Government to be a party to that kind of thing, and at the same time to have you come before us and ask us to extend the general application to the rest of industry, it seems to me is absolutely inexcusable, and I would ask that the Department look into this situation and report to this committee. . . .
>
> Mr. HAWKINS. Would you add to that, Mr. Chairman, also the employees, as I understand, here in the Capitol? Some investigation should be made of them. I understand that there are many of them that are working at $1 an hour.
>
> Mr. ROOSEVELT. If it is possible, Mr. Secretary, for you to give us information as to anywhere in the Government service where people are legally working on Government payrolls at less than the minimum wage, we would like to have it.

* * * * * *

> [W]e had better drop this entire bill . . . if the Government can't apply the same standard it is applying to other people, to itself, [because] then we don't have much basis for what we are doing.

House Hearings, pt. 1, at 59–60. Secretary Wirtz agreed to provide the requested information, but he expressed some concern about Mr. Roosevelt's apparent view that the Government was obliged to pay the FLSA minimum wage rate:

> [I]t should be made quite clear that the question is whether the Government should do voluntarily, and in the absence of legal obligation, that which the Congress has required in certain areas. . . .
>
> Now, I agree with the point, Mr. Chairman, but the Government does, in its administrative capacity, already go beyond what the Congress has required of industry.
>
> I hope especially in view of your admonition, I can expand the area of that, or be helpful in expanding the area of that voluntary action but it is not that we act in a way which is different from what is required.

*Id.* at 60–61.

The bill that emerged from the Committee's deliberations contained two sections dealing with the problems discussed above. One of these required that "every employer providing a contract service under a contract with the United States, or any subcontract thereunder, must pay" the FLSA minimum wage rate.[17] The second required payment of FLSA minimum wage and overtime rates to "certain Federal wage

---

16. A total of six volumes of hearings were published. Hearings on Minimum Wage-Hour Amendments, 1965, H.R. 8259, Before the Subcomm. on Labor of the House Comm. on Education and Labor, 89th Cong., 1st Sess., pts. 1–3 (1965) (hereafter House Hearings); Hearings on Amendments to the Fair Labor Standards Act, S. 763, S. 1741, S. 1770, S. 1986, & S. 2210, Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 89th Cong., 1st & 2d Sess., pts. 1–4 (1965 & 1966).

17. H.R.Rep. No. 1366, 89th Cong., 2d Sess. 44 (1966). This portion of the House bill was adopted virtually intact as Section 305 of the final act.

board employees and employees in non-appropriated fund instrumentalities of the Armed Forces, e. g. post exchanges," but, only to those employees working within the United States.[18] The House passed and sent to the Senate the bill containing these provisions.

In its provision concerning federal employees, the Senate bill differed in three respects from the House version: (1) another class of employees was added, (2) the geographical limitation was dropped, and (3) *a specific provision dealing with federal employees in the Canal Zone was added.*[19] The language dealing with the Canal Zone employees was added to the bill in committee by Senator Morse.[20] Since this language had been added after closing the hearings, Senator Morse inserted a personal statement and all the correspondence received by the committee into the *Congressional Record* to serve as the legislative history behind the provision.

Opposition to the proposal[21] centered on increased operating costs resulting from higher wage rates, with the resultant possibility that these might lead to higher tolls on ships using the Canal. Another rationale for opposing the bill was that it would increase an already large wage differential between Panamanian citizens employed in the Canal Zone and in the Republic of Panama itself.[22] This differential, it was argued, would impede the integration of the Canal Zone into the Panamanian economy and might serve to intensify political frictions with the government of Panama.

This last fear was laid to rest by a letter from the Minister of Foreign Relations of the Republic of Panama, dated May 30, 1966:

> I am of the opinion that an argument of this type would be totally unfounded. In effect, the different administrations that the Republic has had have always defended in favor of the Panamanian worker in the service of the Government of the United States of America in the Canal Zone and of the private enterprises that work for it, *their right to earn, equal with the United States worker, the same salary for the same work.*

112 Cong.Rec. 20833 (1966) (emphasis added). It would seem from this letter that the most likely source of political friction with the Panamanian government was the wage differential between American and Panamanian Canal workers, rather than between Panamanians working in the Canal Zone and in the Republic. Senator Morse recognized this as the critical problem,[23] and while acknowledging that his amendment would surely lead to higher costs and possibly

---

18. *Id.*

19. H.R.Rep. No. 2004 (Conference Report), 89th Cong., 2d Sess. 12, 20 (1966).

20. 112 Cong.Rec. 20830 (1966).

21. Correspondence in opposition to the Morse amendment came from the Under Secretary of the Army (the Department of the Army is directly interested in the Panama Canal Company), the Intercoastal Steamship Freight Association and the American Merchant Marine Institute (both associations composed of users of the Canal). *Id.* at 20831.

22. The American Merchant Marine Institute so contended. *Id.* Senator Morse explained his rationale for equality of wages in the Canal Zone and in the U.S.:

> We should be doing everything we can to impress upon Panamanians and La-

tin Americans everywhere that the Canal is a boon to private enterprise and that its fruits can and will be shared on a basis of *full equality.*

*Id.* at 20830 (emphasis added).

23. But I assure Senators that disparity among Panamanians is not the source of dissent. Dissension arises from the disparity in wages paid to Americans and Panamanians who each work for the United States in the Zone, and despite all the assurances that the pay is equal, the fact is that it is not.

The American worker doing the same work as a Panamanian receives in theory the same wage. But on top of it he receives what is called a "tropical living allowance" which the Panamanian does not receive.

*Id.*

to higher canal tolls,[24] he stated the basic purpose of his amendment:

> What is at issue here is whether the Canal Zone government is going to pay Panamanian nationals—for it is they who are at the bottom of the wage scale and hold most of the jobs that would be affected—a statutory minimum wage which must be paid to Americans elsewhere, and *which must be paid to American and Panamanians alike in the Canal Zone if they are employed by private employers.*

*Id.* at 20830 (emphasis added). The purpose of this legislation, then, as stated by the author, was to achieve wage comparability for Government employees— both comparability between Panamanian and American nationals, and comparability between Government employees and employees of private enterprises working in the Canal Zone.

The Conference Committee adopted the Senate version of the bill, with Senator Morse's Canal Zone amendment intact. Presenting the Conference bill to the Senate, Senator Yarborough, the Floor Manager, described the federal employee provision as follows:

> The bill would incorporate in a new section 18(b) of the [FLSA] the policy of paying minimum wages and overtime pay *as required by the act* to certain Federal wage board employees. . . .

112 Cong.Rec. 22651 (1966) (emphasis added). Coupled with the operative provisions of Section 18(b), that these employees would have their wages and overtime compensation set at rates no lower than those provided in Sections 6 & 7 of the FLSA, we find in such statements a convincing repudiation of the appellants' theory that this act was intended to import only minimum wage

rate provisions of the FLSA into federal employment.

██ Under Section 18(b) the minimum wage and overtime compensation requirements of the FLSA were imposed upon the Panama Canal Company to require it to pay its employees according to the prescribed statutory schedules of rates and hours for the regular and overtime hours that they worked. But the Portal-to-Portal Act applies to all pay schedules under the FLSA and explicitly relieves the Company from "any liability . . . under the [FLSA]" for certain specifically enumerated activities. In other words, the Portal-to-Portal Act operates to deprive employees covered by the FLSA of any cause of action against their employer for either minimum wage or overtime compensation under the FLSA for the activities specified in the Portal Act. Although the appellants here were brought within the coverage of the FLSA by Section 18(b), the Portal Act denies them a cause of action against the Canal Company for overtime compensation under FLSA.

The purpose of the Morse amendment, to achieve comparability of treatment between federal and private employees in the Canal Zone, would be defeated if only the benefits of FLSA (*e. g.* its minimum rates) and not its limitations (*e. g.* the Portal-to-Portal Act definition of noncompensable activities) were held to apply to appellants. The limitations of the Portal-to-Portal Act are an integral part of the overtime compensation prescribed by the FLSA. If these limitations were to be ignored, what started out to provide for equality between private employees who were under FLSA and these Canal employees who were not covered, would end up by placing the Canal employees in the superior position. However, since Congress merely

---

24. I am concerned about the possibility that paying Panamanians a minimum wage will result in some increase in canal tolls. The canal is self-supporting. It does not receive appropriations. It fixes tolls according to costs. The

wage cost will go up if the bill is enacted in this form.

But I ask Senators, what wage cost will not go up upon enactment of this bill, where the wages paid are less than the figures included in the bill? *Id.*

intended to provide for equality of treatment between the two groups, and since those private employees are subject to the limitations of the Portal-to-Portal Act, we believe Congress intended those federal employees (including these Canal Company employees) brought within the FLSA by Section 18(b) to also be governed by the Portal-to-Portal Act provisions.[25]

### 2. 1967 enactments relating to 5 U.S.C. § 5544.

■ Although appellants are explicitly within the category of federal employees described in Section 18(b) of the FLSA, to which section we believe the Portal-to-Portal Act clearly applies, they chose to bring this action under a section of the Federal Employees Pay Act (FEPA), 5 U.S.C. § 5544.[26] Appellants argue that regardless of our view of the applicability of the Portal-to-Portal Act to FLSA § 18(b), that Act cannot be construed to limit their entitlement to compensation under 5 U.S.C. § 5544. Their argument has some merit, for the operative scheme of the Portal-to-Portal Act is to exempt employers from liability under the FLSA and two other specifically enumerated acts not including the FEPA. Strict adherence to the old maxim *expressio unius est exclusio al-*

*terius* or a mechanical application of the rule that the role of the court "is to construe what Congress has written . . . neither to add nor to subtract,"[27] would preclude our extending the applicability of the Portal Act to 5 U.S.C. § 5544.

But rigidly technical application of such rules has been frequently and authoritatively repudiated:

The maxim invoked expresses a rule of construction, not of substantive law, and serves only as an aid in discovering the legislative intent when that is not otherwise manifest. . . .

Much of our national legislation is embodied in codes, or systematic collections of general rules, each dealing in a comprehensive way with some general subject, . . . and it is the settled rule of decision in this court that where there is subsequent legislation upon such a subject, it carries with it an implication that the general rules are not superseded, but are to be applied in its enforcement, save as the contrary clearly appears.

United States v. Barnes, 222 U.S. 513, 519, 520, 32 S.Ct. 117, 118, 56 L.Ed. 291 (1912).

However well these rules may serve at times to aid in deciphering legislative intent, they long have been subordi-

---

25. Appellants argue that the "Notwithstanding any other provision of this Act . . . or any other law . . . ." language at the beginning of § 18(b) explicitly excludes Portal-to-Portal Act application to the federal employees covered therein. We do not believe this exclusionary clause operates so broadly. To begin, its principle purpose was clearly to avoid the § 3(d) definition of "employer" that excluded the United States as an employer from coverage under the FLSA. 29 U.S.C. § 203(d). Next, as noted in the Senate Report, the clause operates to exclude "the industry committee procedures of section 6(c) [29 U.S.C. § 206(c)] . . . with respect to Federal employees employed in Puerto Rico and the Virgin Islands." S.Rep. No. 1487, *supra*, at 34, U.S.Code Cong. & Admin.News 1966, p. 3036. Finally, the statute of limitations for the FLSA is contained in Section 6 of the Portal-to-Portal Act, 29 U.S.C. § 255, and this very

section was amended by Section 601 of the act we are examining here. Fair Labor Standards Amendments of 1966, Pub.L. 89-601, Title VI, § 601, 80 Stat. 844. We cannot assume that, having both Acts before them and considering amendments to both Acts, Congress intended in its "notwithstanding" clause to provide that the statute of limitations did not apply to wage claims under this one section of the FLSA. And since the limitation statute applicable to the FLSA wage claims is a part of the Portal-to-Portal Act, we cannot assume that the "notwithstanding" clause can be said to have excluded portions of that Act while retaining others.

26. The Company has stipulated that appellants are federal wage board employees under § 5544.

27. 62 Cases of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951).

nated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy. SEC v. C. M. Joiner Leasing Corporation, 320 U.S. 344, 350–51, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943).[28] The general rules embodied in the FLSA are those concerning the establishment of minimum allowable wage rates that an employer may pay his employees for the hours they work. The general rules embodied in the Portal-to-Portal Act are that certain employee activities, which the Supreme Court had found compensable under the FLSA in the *Mt. Clemens Pottery* case, were not entitled to compensation when performed at specified times and places. The operative scheme of the Portal Act—relieving employers from liability for compensating employees for these activities—required express enumeration of the statutes under which, *at that time,* the employer's liability could be incurred. Subsequent legislation either providing new bases for employers' liability, or bringing new groups of employers within the coverage of existing liability provisions, should not be construed to supercede the general rule of the Portal Act defining non-compensable activities "save as the contrary clearly appears." Considering both the text of the Portal Act and the context of the legislative policy applied therein to free employers from the obligation to compensate their employees for certain activities, we find that the interpretation of 5 U.S.C. § 5544 advocated by appellants would wholly abrogate that legislative policy. This we cannot do.

Yet we need not take this step on our own, relying solely on the legislative policy of the Portal-to-Portal Act. For in its policy of wage comparability between federal and private employees, as expressed in two separate enactments in 1967, Congress has provided us with a clear demonstration of their intent that these federal (Canal Company) employees should receive wage and hour treatment substantially equivalent to their counterparts in private enterprises.

*Act of September 11, 1967.*[29] This Act, titled "An Act to amend titles 5, 14, and 37, United States Code, to codify recent law, and to improve the Code,"[30] contains a superficially minor technical revision to the 1966 amendment which added Section 18(b) to the FLSA. This revision, however, reveals a great deal about Congress's concept of the relationship between the FLSA and the FEPA.

In Section 1(97) of the Act Congress incorporated a direct cross reference to the minimum wage provision of FLSA (29 U.S.C. § 206(a) (1)) into 5 U.S.C. § 5341(a)—the basic provision of the FEPA covering compensation of wage board employees. Section 8 of the act amended Section 18(b) of the FLSA, in the words of both the House and Senate Reports accompanying the bill, "to reflect the codification of that part of section 18(b) (1) that applies to Federal employees described in 5 U.S.C. 5341(a)

---

28. *See, e. g.,* Argosy Limited v. Hennigan, 404 F.2d 14, 20 (5th Cir. 1968):
    Statutes are contextual as well as textual. . . . Their proper interpretation requires more than mere linguistic seriation. Courts must also look to the logic of Congress and to the broad national policy which prompted the legislation. [*Citations omitted.*]
    FTC v. Standard Motor Prod., Inc., 371 F.2d 613, 617–18 (2d Cir. 1967); Massachusetts Trustees of Eastern Gas & Fuel Assoc. v. United States, 312 F.2d 214, 220 (1st Cir. 1963), aff'd, 377 U.S. 235,

84 S.Ct. 1236, 12 L.Ed.2d 268 (1964); United States v. National Marine Eng'r Ben. Ass'n, 294 F.2d 385, 390–91 (2d Cir. 1961); Matheson v. Armbrust, 284 F.2d 670, 674–75 (9th Cir. 1960), cert. denied, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860 (1961); 2 Sutherland Statutory Construction § 4917 (3d ed. Horack 1943 & 1971 Supp.)

29. Pub.L. 90–83, §§ 1(97) & 8, 81 Stat. 220, 222.

30. *Id.* at 81 Stat. 195.

by section 1(97) of this bill." [31] *It seems beyond question that the intent of these two sections is to import the FLSA's minimum wage provisions explicitly into the FEPA section covering compensation of wage board employees.*

The committee reports explain why the FLSA's overtime provision was not similarly transposed into the FEPA: "The provisions of section 18(b) relative to overtime compensation are omitted as unnecessary in view of 5 U.S.C. 5544(a)." [32] From this it is apparent that Congress considered 5 U.S.C. § 5544, a special provision relating to overtime compensation of wage board employees, to already be equivalent to Section 7 of the FLSA. In effect, this constitutes a declaration that the portion of Section 18(b) dealing with overtime compensation for wage board employees had been redundant with the previously existing Section 5544. We conclude from this that Congress intended that Section 5544 should operate for federal wage board employees in precisely the same manner as FLSA Section 7 operates for private employees. We thus conclude that the limitations of the Portal-to-Portal Act affect both provisions equally.

■ *The Postal Revenue and Federal Salary Act of 1967.* Appellants place great reliance on the final sentence of 5 U.S.C. § 5544(a), which was added by Section 222 of the Postal Revenue and Federal Salary Act of 1967: [33]

Time spent in a travel status away from the official duty station of an employee subject to this subsection is not hours of work unless the travel (i) involves the performance of work while traveling, (ii) is incident to travel that involves the performance of work while traveling, (iii) is carried out under arduous conditions, or (iv) results from an event which could not be scheduled or controlled administratively.

They argue that: [34]

Had Congress intended the Portal to Portal Act to apply to federal wage board employees, it would not have been necessary for it to have added the above quoted language to 5 U.S.C. Section 5544, especially after it had amended Section 18 of the FLSA [in 1966].

Accordingly, it is the travel time language of 5 U.S.C. Section 5544 to which the district court should have looked for guidance and not the Portal to Portal Act. . . .

This whole approach belies the ordinary meaning of travel—to go on a trip, tour, or journey (Websters 3d New International Dictionary)—and furthermore the legislative history of this amendment directly refutes the interpretation appellants seek to place on it. To begin, appellants' reference to "Section 18 of the FLSA" is surely misguided, since, as we have just shown, the overtime reference in Section 18(b), as it applied to wage board employees other than those working in the Canal Zone, was removed three months prior to this act in the belief that it was redundant with Section 5544. As we shall demonstrate below, the travel time language was added to Section 5544 to *ensure* that redundancy—*i. e.* to make explicit the identity of operation Congress was seeking between Section 5544 and the FLSA's overtime provisions.

The travel provision began as an amendment to the House bill during House consideration of the measure. Among the many compromises accompanying passage of the House bill was a reduction in the proposed salary increase for classified employees. Representative Udall, one of the bill's sponsors, re-

---

31. H.R.Rep. No. 124, 90th Cong., 1st Sess. 28 (1967); S.Rep. No. 482, 90th Cong., 1st Sess. 32 (1967), U.S.Code Cong. & Admin.News 1967, p. 1568. Section 8 of the act also deleted a class of employees from Section 18(b) that had been eliminated in other legislation, and up-dated some of the cross-referenced Code sections.

32. *Id.* at 28 and 31.

33. Pub.L. 90–206, Title II, § 222, 81 Stat. 641.

34. Brief for appellants, at 17–18.

ported to the House that to compensate for this reduction "we consulted with these people to find out which fringe benefit amendment they feel is the most urgent, which would cost the least, and which would give justice to their people." 113 Cong.Rec. 28641 (1967). The travel pay provision, proposed as an amendment to 5 U.S.C. § 5542 (the general overtime authorization for classified employees), was described by Mr. Udall as follows:

> This amendment picks up the fair labor standards provisions that apply *in private enterprise* and attempts to make a beginning to link the Government treatment of overtime and premium pay for overtime involved in the cost of travel to *private enterprise standards*.

*Id.* (emphasis added). The intent to attain comparability with FLSA standards could hardly have been expressed more clearly.

The House bill was considered by the Senate Post Office and Civil Service Committee, which chose to expand on the "beginning" made in the House by extending the travel provisions to include wage board and postal field service employees as well as the classified service.[35] This extension was accomplished, *inter alia,* by the Senate adding to 5 U.S.C. § 5544(a) the precise language that was subsequently adopted. Identical language was added to 5 U.S.C. § 5542 and 39 U.S.C. § 3571 to cover classified and postal employees. The Conference Committee's substitute bill adopted the Senate version of the travel provision,[36] and was enacted as Section 222 of the Postal Revenue and Federal Salary Act of 1967.

In addition to Representative Udall's statement concerning the intent to make these provisions comparable to private enterprise standards, we find other indications that this amendment to Section 5544 was designed to compensate travel different in both type and extent from that for which appellants are seeking overtime pay. Appellants have focused on the Company's inability to predict the location of the locomotives from shift to shift to support the contention that their "travel" is compensable because it "results from an event which could not be scheduled or controlled administratively." Mr. Udall's formulation of this particular provision had read: "[time spent in travel outside the regularly scheduled workweek] is hours of work, if—(1) the employee is required to travel for a substantial distance because of an emergency arising from an event that could not be scheduled or controlled administratively. . . . " 113 Cong. Rec. 28640 (1967). Admittedly, the Senate's, and the final statute's, abbreviation of this highly specific provision might be construed as an attempt to make it more broadly inclusive of other situations than those covered by Mr. Udall. But the Senate Report belies such a liberalizing intent and indicates an intent more in keeping with the ordinary meaning of the word "travel." In 1965 an act had been passed directing agencies to schedule travel away from the official duty station within the regularly scheduled workweek "[t]o the maximum extent practicable."[37] The Senate Report notes[38]:

> We are not satisfied with the progress agencies have made to comply with the 1965 act. An employee should not be required to travel on his offday in order to be at work at a temporary duty station early Monday morning to attend a meeting. It is an imposition upon his private life that should not be made. . . . Proper scheduling and administrative planning is the answer to the problems of travel pay in many cases.

---

35. S.Rep. No. 801, 90th Cong., 1st Sess. 30 (1967), U.S.Code Cong. & Admin.News 1967, p. 2258.

36. H.R.Rep. No. 1013, 90th Cong., 1st Sess. 29 (1967).

37. Federal Employees Salary Act of 1965, Pub.L. 89–301, § 16, Oct. 29, 1965, 79 Stat. 1123.

38. S.Rep. No. 801, *supra* note 35, at 31, U.S.Code Cong. & Admin.News 1967, p. 2288.

When emergencies occur or when events cannot be controlled realistically by those in authority, traveltime must be paid for.

The extent of the travel so referred to, from Sunday to Monday, indicates that Congress in this portion of the report was referring to travel more in the sense of a journey. It is clear to us that the "traveltime" made compensable under Section 5544 by events not capable of administrative scheduling or control was not intended to encompass the appellants' daily two to fifteen minute walks to their locomotives from the gate.

Finally, we find in the structure of the 1967 travel pay provisions further reason to believe that Congress intended to equate federal and private enterprise employees' compensation in regard to travel time. The Wage and Hour Division of the Department of Labor has promulgated regulations pursuant to the FLSA to explain and illustrate the application of that act to various travel situations. 29 C.F.R. §§ 785.33–.41 (1971). An examination of these regulations reveals a striking parallel between the descriptions of compensable travel time included therein and the enumerated categories of compensable travel found in the 1967 Act's amendments to Section 5544. Each example of compensable travel time in the FLSA regulations is included within one of the compensable categories of the 1967 Act, and the 1967 Act contains an additional category not included in the regulations.[39] Equally significant is that § 785.34 of these regulations describes the "[e]ffect of section 4 of the Portal-to-Portal Act" on compensation for travel time. If, to paraphrase the appellants' contention, Congress intended the Portal-to-Portal Act *not* to apply to federal wage board employees, we submit that they would have so indicated by inserting *another* additional category of compensable travel expressly providing for portal-to-portal payment. We consider their failure to do so to be a further reflection of their intent to pursue the policy of wage comparability between federal and private enterprise employees.[40]

39. *Compare* § 5544 "(i) involves the performance of work while traveling" *with* 29 C.F.R. "§ 785.41 Work performed while traveling." *Compare* "(ii) is incident to travel that involves the performance of work while traveling" *with* "§ 785.38 Travel that is all in the day's work." *Compare* "(iv) results from an event which could not be scheduled or controlled administratively" *with* "§ 785.36 Home to work in emergency situations" *and* "§ 785.37 Home to work on special one-day assignment in another city" *and* "§ 785.39 Travel away from home community." Section 5544's condition "(iii) is carried out under arduous conditions" has no direct parallel in these regulations, but may easily be read as a codification of the results of such cases as, *e. g.*, Tennessee Coal Co. v. Muscoda Local No. 123, 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949 (1944) (construing the FLSA), and Anderson v. Panama Canal Co., 194 F.Supp. 765, 783 (D.C.Z.1961) (construing the predecessor statute to 5 U.S.C. § 5544), rev'd on other grounds, 312 F.2d 98 (5th Cir.), cert. denied, 375 U.S. 832, 84 S.Ct. 43, 11 L.Ed.2d 63 (1963). Thus even this condition reflects the comparability between the respective FLSA and FEPA provisions.

40. Although we have concluded above that Congress intended the Portal-to-Portal Act limitations on compensable overtime to apply to federal wage board employees covered under 5 U.S.C. § 5544(a), we believe that the same result could have been reached as to these Canal Zone employees by a different route. Because of the parties' stipulation below that these employees were within the coverage of § 5544, that issue was not litigated here. We note, however, that § 5544 derives from the Independent Offices Appropriation Act, 1935, ch. 102, Title II, § 23, 48 Stat. 522. Insofar as this statute relates to overtime compensation for Canal Company employees it was impliedly amended by the Fair Labor Standards Amendments of 1966, Pub.L. 89–601, Title III, § 306, 80 Stat. 841—the statute which explicitly applies the FLSA overtime compensation provision (with its Portal-to-Portal Act limitations) to wage board employees in the Canal Zone. As a later enactment, and as a specific enactment, the new Section 18(b) of the FLSA would seem to take precedence over the earlier, generally applicable, Section 5544. (Significantly, even the codification of § 5544 in its present location in the United States Code preceded enactment of

## III.

In *Abbott v. United States*, 151 F. Supp. 929 (Ct.Cl.1957), ship pilots employed by the Panama Canal Company successfully sought overtime compensation for return trips to their home base after piloting a vessel through the Canal. The practice of the Company had been to consider these trips as working time and compensable when completed during the pilot's normal working hours, but non-compensable when made after the regular workweek or on the pilot's day off. The Court of Claims found this to be an irrational distinction, and since the normal custom was to compensate for these trips the court ordered that the pilots should be compensated whenever such trips occurred.

■ The Canal Company presently compensates locomotive operators called in on an emergency or stand-by basis from the moment they enter the gate to the lockage area, and the appellants argue by analogy to *Abbott* that the refusal to pay for similar activity incident to regular working hours is also an irrational distinction which requires that compensation be paid on a daily basis from their initial entry into the lockage area. The District Court distinguished *Abbott* by finding that

> [T]he emergency call-in for a locomotive operator creates an entirely different work situation than the normal scheduled work day. An emergency operator is in a stand-by situation without a particular duty station to report to immediately. Since he does not have an assigned duty station,

and since he is present primarily for the benefit of the Company, a different standard must be used to fix his compensation and he is paid from the time he enters the main gate.[41]

We concur that *Abbott* does not apply here. The place, manner and circumstances of reporting for an emergency call-in all differ from what occurs in the daily routine and it appears that the Canal Company has properly treated all the employees' activity of such character as compensable. The nature of such emergency call-ins, if travel could be said to be involved, seems to fit the intent expressed in condition (iv) of the travel pay provisions of Section 5544. The irregular and isolated nature of emergency call-ins seems to "result from an event which could not be scheduled or controlled administratively" while the regular daily reporting practices do not fall within such definition.[42]

## IV.

We thus conclude that the congressional policy of the Portal-to-Portal Act to preclude compensation for activities such as those performed by these appellants, the policy of Section 18(b) of the FLSA to ensure equal compensation for private and federal employees in the Canal Zone, and the general policy of salary comparability between federal and private enterprise employees which is implicit in this legislation would all be thwarted were we to adopt appellants' position on this appeal. Accordingly, the judgment of the District Court is

Affirmed.

Section 18(b) by 17 days, *compare* 80 Stat. 486 *with* 80 Stat. 841, and Section 18(b)'s specific reference to Canal Zone employees was reiterated the following year, 81 Stat. 222.) We do not believe the enactment of the travel time provision in Section 5544 (81 Stat. 641) subsequent to the enactment of Section 18(b) affects this analysis at all, since such amendment does not alter the principal statutory language dealing with overtime compensation and it covers factual situations different from those under consideration here.

41. 314 F.Supp. at 388 n. 1.

42. We also reject appellants' argument that they fall within the scope of *Anderson v. Panama Canal Co., supra* note 39. As suggested above, we find the determinative issue in *Anderson* to have been that the employees there were expected to perform arduous tasks under unpleasant and often dangerous conditions during the course of their travel. These circumstances are, we believe, incorporated within the third category of compensable travel under 5 U.S.C. § 5544. Appellants have made no claim under this category for their daily walk to the locomotives.